**UNION CARBIDE CORPORATION,
Plaintiff–Appellant,**

**v.**

**OSCAR MAYER FOODS CORPORATION, Defendant–Appellee.**

No. 90–3470.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1991.
Decided Nov. 15, 1991.

Lawrence C. Rubin (argued), Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff-appellant.

Michael R. Feagley, Michele Odorizzi, and Douglas Belofsky (argued), Mayer, Brown & Platt, Chicago, Ill., for defendant-appellee.

Before POSNER, FLAUM, and MANION, Circuit Judges.

POSNER, Circuit Judge.

This is a diversity suit for breach of contract, brought by Union Carbide against Oscar Mayer and resolved in the defendant's favor on summary judgment. Union Carbide sold Oscar Mayer plastic casings that Oscar Mayer uses in manufacturing sausages. The prices in Union Carbide's invoices to Oscar Mayer included two 1 percent sales taxes that are applicable to sales which originate in Chicago. Another supplier of plastic sausage casings to Oscar Mayer began charging a price that was 1 percent lower than Union Carbide's. This supplier had begun accepting orders at an office outside of Chicago and had decided that therefore it didn't have to pay one of the sales taxes (why one but not both is unclear). When Oscar Mayer informed Union Carbide of this, Union Carbide instructed its customers likewise to send their orders to an address outside Chicago, and it stopped paying both sales taxes and therefore deleted them from the invoices it sent Oscar Mayer. Thus Union Carbide had met and indeed beat the other supplier's discount by lowering its price 2 percent compared to the other supplier's reduction of 1 percent.

All this was in 1980. Eight years later the Illinois tax authorities decided that the two sales taxes were due notwithstanding the change of address and assessed Union Carbide $88,000 in back taxes on sales to Oscar Mayer and $55,000 in interest thereon. Union Carbide paid and then turned around and brought this suit to recover what it had paid from Oscar Mayer, claiming that Oscar Mayer had agreed to indemnify it for all sales tax liability. It relied on the following provision printed on the back of its invoices to Oscar Mayer and also in a "price book" that it sent its customers: "In addition to the purchase price, Buyer shall pay Seller the amount of all governmental taxes ... that Seller *may be required* to pay with respect to the production, sale or transportation of any materials delivered hereunder." (Emphasis added.)

■ Union Carbide's claim nestles comfortably within this language, but that is only the beginning of analysis. The language is equally comfortably read to mean simply that the seller shall be permitted to add on to the agreed purchase price the amount of whatever sales tax is applicable to the purchase—which is a quite different reading from supposing that it imposes on the buyer an open-ended liability to pay back taxes, interest, and even fraud penalties (though an attempt to shift the last might be forbidden as contrary to public policy, cf. *Zuckerman–Vernon Corp. v. Rosen*, 361 So.2d 804, 806 (Fla.App.1978); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 5.2, at p. 12 (1990)), perhaps many years after taking delivery, because the seller blundered in computing its tax liability. That may be a semantically permissible, but it is an economically implausible, reading. Contracts and contract law normally seek to impose liability for a mistake on the party to the contract who is in the better position either to prevent the mistake, or to reduce its disutility by means of market insurance or self-insurance. *Argonaut Ins. Co. v. Town of Cloverdale*, 699 F.2d 417, 420 (7th Cir.1983); *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir.1986); *Spartech Corp. v. Opper*, 890 F.2d 949, 955 (7th Cir.1989); Anthony T. Kronman, "Mistake, Disclosure, Information, and the Law of Contracts," 7 *J. Legal Stud.* 1, 4 (1978). The party better able to prevent a mistake about how much tax is owed is surely the taxpayer rather than the taxpayer's customer. We don't know whether Oscar Mayer pays *any* sales taxes in Illinois. We do know it was not dunned for the two taxes in issue; as to them the taxing authorities dealt exclusively with Union Carbide. There is no suggestion

that, should the mistake be treated as unavoidable, either party was the superior insurer.

The background to the dispute also makes Union Carbide's reading implausible. Oscar Mayer was asking Union Carbide to match a competitor's price reduction. That reduction, as far as we can tell, was unconditional. The competitor wasn't saying to Oscar Mayer, "We'll give you a discount but maybe a few years from now we'll ask for it back—with interest and maybe a penalty." (At argument one of the lawyers told us that he thought the competitor had also been assessed back taxes by Illinois, just like Union Carbide, though he wasn't sure—but that unlike Union Carbide the competitor did not try to obtain indemnity from Oscar Mayer.) Why should Oscar Mayer accept an open-ended contingent liability, which would require it to establish on its books a reserve against the possibility of being forced years later to bail Union Carbide out of a tax dispute with the state, when another supplier was offering it the same price without the liability? Well, but it wasn't the same price; the other supplier was offering a 1 percent discount, and Union Carbide offered 2 percent. Maybe the extra 1 percent was compensation for bearing the risk of having to repay the discount—with interest—later on. But Union Carbide doesn't even argue this. It does argue that a tax-indemnity provision is not so unusual as we imagine, because the record contains an invoice from still another supplier of sausage casings which states that "if the sale merchandise listed herein is *or hereafter becomes* subject to sales, or use or processing tax, buyer shall be liable for same" (emphasis added). But this may not be an indemnity provision either. It could just mean that if, after the mailing of the invoice, a tax is imposed and is applicable to the sale, the buyer agrees to pay it. Anyway the language is different from that of Union Carbide's invoices.

We think that Union Carbide has misread the contract and that this is clear enough to be determined without a trial, as in *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709 (7th Cir.1987). It used to be that the meaning of a written contract was in almost all cases a question to be decided by the judge and without resort to evidence outside the contract itself. Today, however, "the jury decides the meaning of the contract in all cases in which that meaning has for any reason been fairly drawn into doubt." *Agfa–Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1522 (7th Cir.1989). But it hasn't been here.

■ We also agree with the district judge that if read as an indemnity clause the quoted provision is a material alteration in the parties' contract and is therefore unenforceable against Oscar Mayer because not agreed to. The common law rule was that if the purported acceptance of an offer was not identical to the offer, the acceptance was a fresh offer and had to be expressly accepted by the original offeror for the parties to have a contract. *Step–Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91, 99 (3d Cir.1991); *C. Itoh & Co (America) Inc. v. Jordan International Co.*, 552 F.2d 1228, 1234–35 (7th Cir.1977); *Clifford–Jacobs Forging Co. v. Capital Engineering & Mfg. Co.*, 107 Ill. App.3d 29, 31, 62 Ill.Dec. 785, 787, 437 N.E.2d 22, 24 (1982); *Poel v. Brunswick–Balke–Collender Co.*, 216 N.Y. 310, 319, 110 N.E. 619, 622 (1915). This "mirror image" rule (on which see Douglas G. Baird & Robert Weisberg, "Rules, Standards, and the Battle of the Forms: A Reassessment of § 2–207," 68 *Va.L.Rev.* 1217, 1231–37 (1982)) was widely believed to take insufficient account of the incorrigible fallibility of human beings engaged in commercial as in other dealings, and is changed by the Uniform Commercial Code, which allows an acceptance to make a contract even if it adds terms to the offer. UCC § 2–207(1), Ill.Rev.Stat. ch. 26, ¶ 2–207(1). Moreover, if it is a contract between "merchants" (in the sense of "pros," UCC § 2–104(1) and Official Comment thereto—as Union Carbide and Oscar Mayer are), the additional terms become part of the contract. UCC § 2–207(2). But not any additional terms; only those to which the offeror would be unlikely to object, because they fill out the contract in an

expectable fashion, and hence do not alter it materially. If a term added by the offeree in his acceptance works a material alteration of the offer, the acceptance is still effective, but the term is not: that is, the contract is enforceable minus the term the offeree tried to add. UCC §§ 2–207(1), (2); *Comark Merchandising, Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1201 (7th Cir. 1991); *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir. 1984); *Barliant v. Follett Corp.*, 138 Ill. App.3d 756, 761, 91 Ill.Dec. 677, 680, 483 N.E.2d 1312, 1315 (1985); see generally Caroline N. Brown, "Restoring Peace in the Battle of the Forms: A Framework for Making Uniform Commercial Code Section 2–207 Work," 69 *N.C.L.Rev.* 893 (1991).

■ An alteration is material if consent to it cannot be presumed. That is our gloss; the cases more commonly speak of "unreasonable surprise," as in *Clifford–Jacobs Forging Co. v. Capital Engineering & Mfg. Co.*, *supra*, 107 Ill.App.3d at 33, 62 Ill.Dec. at 788, 437 N.E.2d at 25. But it comes to the same thing. What is expectable, hence unsurprising, is okay; what is unexpected, hence surprising, is not. Not infrequently the test is said to be "surprise or hardship," e.g., *Trans–Aire International, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1260–61 (7th Cir.1989); 1 Farnsworth, *supra*, § 3.21, at p. 266, but this appears to be a misreading of Official Comment 4 to UCC § 2–207. The comment offers examples of "typical clauses which would normally 'materially alter' the contract *and so result in surprise or hardship* if incorporated without express awareness by the other party" (emphasis added). Hardship is a consequence, not a criterion. (Surprise can be either.) *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, *supra*, 831 F.2d at 714. You cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you, unless you can squeeze yourself into the impossibility defense or some related doctrine of excuse. *Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir.1991).

This is not the end of the analysis, however. Like most doctrines of contract law, the doctrine of material alteration is an aid to interpretation rather than an ironclad rule. *Clifford–Jacobs Forging Co. v. Capital Engineering & Mfg. Co.*, *supra*, 107 Ill.App.3d at 33, 62 Ill.Dec. at 788, 437 N.E.2d at 25; *Trans–Aire International, Inc. v. Northern Adhesive Co.*, *supra*, 882 F.2d at 1261. Even if the alteration is material, the other party can, of course, decide to accept it, as in *Twin Discs, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1334–35 (7th Cir.1985), and then the doctrine of material alteration is out the window. Put differently, consent can be inferred from other things besides the unsurprising character of the new term: even from silence, in the face of a course of dealings that makes it reasonable for the other party to infer consent from a failure to object. *First National Bank v. Atlantic Tele–Network Co.*, 946 F.2d 516, 519 (7th Cir.1991); 1 Farnsworth, *supra*, at § 3.15; *Restatement (Second) of Contracts* §§ 69(1)(b), (c) (1981); *Fineman v. Citicorp USA, Inc.*, 137 Ill.App.3d 1035, 1042, 92 Ill.Dec. 780, 784, 485 N.E.2d 591, 595 (1985). *Twin Discs* was itself such a case.

Cases such as *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, *supra*, 831 F.2d at 715, merging the question of material alteration with that of silence as consent, hold that if the new term is contained in a succession of invoices or other forms, the recipient cannot claim unfair surprise and is therefore bound by it (the "therefore" implicitly deriving from the principle that a course of dealings can be the basis for treating silence as acceptance of an offer). But it assists clear analysis to separate the two issues. They are close but distinct. If the new term does not effect a material alteration, silence is consent, period. If it does effect a material alteration, the party who proposed it must present additional evidence, beyond the term itself, to show that he was reasonable to infer consent to the new term from the other party's failure to object (silence); ordinarily this will be evidence of prior dealings, unnecessary if the new term did *not* effect a material

alteration. Finally, an offeror can protect himself against additional terms, material or not, by expressly limiting acceptance to the terms of the offer. UCC § 2–207(2)(a); *Alan Wood Steel Co. v. Capital Equipment Enterprises, Inc.,* 39 Ill.App.3d 48, 55, 349 N.E.2d 627, 634 (1976).

■ To summarize, a term inserted by the offeree is ineffectual (1) if the offer expressly limits acceptance to the terms of the offer, or (2) if the new term (a) makes a material alteration, in the sense that consent to it cannot be presumed, and (b) there is no showing that the offeror in fact consented to the alteration—whether (i) expressly, or (ii) by silence against the background of a course of dealings.

Having got the law as straight as we can, let us return to the facts. The record does not reveal the origins of Union Carbide's dealings with Oscar Mayer. All we know is that in 1980 the parties' method of dealing was as follows. Oscar Mayer would from time to time send large purchase orders to Union Carbide which would not be filled immediately but instead would be filed for future reference. When Oscar Mayer actually needed casings it would phone Union Carbide and tell it how many it needed and Union Carbide would ship the casings the next day. After the casings arrived Oscar Mayer would send Union Carbide a purchase order for the shipment on the same form used for the standing orders. These "release orders," as the specific purchase orders were called, were like checks written against a bank account (the standing orders)—only this was a sausage-casings account. At about the same time that Oscar Mayer sent Union Carbide a release order, Union Carbide would send Oscar Mayer an invoice for the shipment— and the so-called indemnity clause was, as we noted at the outset, on the back of the invoice and also in a price book that Union Carbide sent its customers from time to time. So every actual purchase of sausage casings involved an exchange of four documents: the standing order, the price book, the release order, the invoice. Such a pattern of sequential exchange of documents governing a single sale is a prototypical situation for the application of UCC § 2–207. See Official Comment 1.

Union Carbide does not question that for purposes of our decision the purchase orders by Oscar Mayer are the offers and Union Carbide's invoices are the acceptances, and that the price book, if it be assumed to be an offer (but cf. 1 Farnsworth, *supra,* § 3.10, at pp. 216–17), was never accepted. So the indemnity clause (if, contrary to our view, that is what it was) was binding on Oscar Mayer only if the clause did not work a material alteration of the terms in the purchase orders.

Those orders don't exactly *discuss* taxes, but they contain a space for sales tax to be added into the purchase price, and Union Carbide points out that, consistent with this indication of willingness to pay sales tax, Oscar Mayer paid uncomplainingly all sales taxes that appeared on Union Carbide's invoices. Nor does Oscar Mayer deny that it was contractually obligated to do so, by virtue less of anything said in the documents than of a tacit understanding inferable from the parties' previous dealings. UCC § 1–205(1); *In re Elcona Homes Corp.,* 863 F.2d 483, 487 (7th Cir.1988); 2 Farnsworth, *supra,* § 7.13, at pp. 282–83. If the sales tax rates had risen, Oscar Mayer would have had to pay the higher rates. What difference does it make, asks Union Carbide, if the increase took the form of an assessment of back taxes? It makes a big difference, amounting to a material alteration to which Oscar Mayer did not consent either explicitly or implicitly. If a tax increase showed up on an invoice, Oscar Mayer would have to pay but might then decide to cease buying casings from Union Carbide, as it had every right to do; it did not have a requirements contract with Union Carbide but could switch at will to other suppliers some of whom might not be subject to the tax. To assume responsibility for taxes shown on an individual invoice is quite different from assuming an open-ended, indeed incalculable, liability for back taxes. Construed (improperly in our view) as an indemnity clause, as Union Carbide urges, the tax clause altered the contract materially; and since the clause was at best ambiguous

about indemnity, this is not a case where consent can realistically be inferred from Oscar Mayer's silence in the face of a succession of acceptances (Union Carbide's invoices) containing the new term.

There was no breach of contract. The judgment for the defendant is

AFFIRMED.