NORTHROP CORPORATION, Plaintiff–Appellee/Cross–Appellant,

v.

LITRONIC INDUSTRIES, Defendant–Appellant/Cross–Appellee.

Nos. 93–3912, 93–4000.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1994.

Decided July 18, 1994.

James T. Ryan (argued), Laura M. Maul, Ryan & Nelson, Laura M. Henry, Ryan, Nelson & McSherry, Arlington Heights, IL, Stephen M. Szarmack, Quantum Financial Services, Inc., Chicago, IL, for Northrup Corp.

David E. Gordon, Gerald B. Mullin (argued), Rosenthal & Schanfield, Chicago, IL, for Litronic Industries.

Before POSNER, Chief Judge, and HILL * and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

"Battle of the forms" refers to the not uncommon situation in which one business firm makes an offer in the form of a pre-printed form contract and the offeree responds with its own form contract. At common law, any discrepancy between the forms would prevent the offeree's response from operating as an acceptance. See *Poel v. Brunswick–Balke–Collender Co.,* 216 N.Y. 310, 110 N.E. 619, 621–22 (1915). So there would be no contract in such a case. This was the "mirror image" rule, which Article 2 of the Uniform Commercial Code jettisoned by providing that "a definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is made conditional on assent to the additional or different terms." UCC § 2–207(1). See *Union Carbide Corp. v. Oscar Mayer Foods Corp.,* 947 F.2d 1333, 1335–36 (7th Cir.1991). Mischief lurks in the words "additional to or different from." The next subsection of 2–207 provides that if additional terms in the acceptance are not materially different from those in the offer, then, subject to certain other qualifications (*id.* at 1335–37), they become part of the contract, § 2–207(2), while if the additional terms are materially different they operate as proposals and so have no effect unless the offeror agrees to them, UCC § 2–207, comment 3; if the offeror does not agree to them, therefore,

* Hon. James C. Hill of the Eleventh Circuit, sitting by designation.

the terms of the contract are those in the offer. A clause providing for interest at normal rates on overdue invoices, or limiting the right to reject goods because of defects falling within customary trade tolerances for acceptance with adjustment, would be the sort of additional term that is not deemed material, and hence it would become a part of the contract even if the offeror never signified acceptance of it. *Id.*, comment 5.

The Code does not explain, however, what happens if the offeree's response contains *different* terms (rather than additional ones) within the meaning of section 2–207(1). There is no consensus on that question. See James J. White & Robert S. Summers, *Uniform Commercial Code* 33–36 (3d ed. 1988); John E. Murray, Jr., "The Chaos of the 'Battle of the Forms': Solutions," 39 *Vand. L.Rev.* 1307, 1354–65 (1986). We know there is a contract because an acceptance is effective even though it contains different terms; but what are the terms of the contract that is brought into being by the offer and acceptance? One view is that the discrepant terms in both the nonidentical offer and the acceptance drop out, and default terms found elsewhere in the Code fill the resulting gap. Another view is that the offeree's discrepant terms drop out and the offeror's become part of the contract. A third view, possibly the most sensible, equates "different" with "additional" and makes the outcome turn on whether the new terms in the acceptance are materially different from the terms in the offer—in which event they operate as proposals, so that the offeror's terms prevail unless he agrees to the variant terms in the acceptance—or not materially different from the terms in the offer, in which event they become part of the contract. John L. Utz, "More on the Battle of the Forms: The Treatment of 'Different' Terms Under the Uniform Commercial Code," 16 *U.C.C.L.J.* 103 (1983). This interpretation equating "different" to "additional," bolstered by drafting history which shows that the omission of "or different" from section 2–207(2) was a drafting error, Utz, *supra*, 16 *U.C.C.L.J.* at 110–12; Murray, *supra*, 39 *Vand.L.Rev.* at 1355, substitutes a manageable inquiry into materiality, *Union Carbide Corp. v. Oscar Mayer Foods Corp., supra,*

947 F.2d at 1336–37; *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 715 (7th Cir.1987); Douglas G. Baird & Robert Weisberg, "Rules, Standards, and the Battle of the Forms: A Reassessment of Section 2–207," 68 *Va.L.Rev.* 1217, 1246 (1982), for a hair-splitting inquiry into the difference between "different" and "additional." It is hair-splitting ("metaphysical," "casuistic," "semantic," in the pejorative senses of these words) because all different terms are additional and all additional terms are different.

Unfortunately, the Illinois courts—whose understanding of Article 2 of the UCC is binding on us because this is a diversity suit governed, all agree, by Illinois law—have had no occasion to choose among the different positions on the consequences of an acceptance that contains "different" terms from the offer. We shall have to choose.

The battle of the forms in this case takes the form of something very like a badminton game, but we can simplify it a bit without distorting the issues. The players are Northrop, the giant defense firm, and Litronic, which manufactures electronic components, including "printed wire boards" that are incorporated into defense weapon systems. In 1987 Northrop sent several manufacturers, including Litronic, a request to submit offers to sell Northrop a customized printed wire board designated by Northrop as a "1714 Board." The request stated that any purchase would be made by means of a purchase order that would set forth terms and conditions that would override any inconsistent terms in the offer. In response, Litronic mailed an offer to sell Northrop four boards for $19,000 apiece, to be delivered within six weeks. The offer contained a 90–day warranty stated to be in lieu of any other warranties, and provided that the terms of the offer would take precedence over any terms proposed by the buyer. Lynch, a purchasing officer of Northrop, responded to the offer in a phone conversation in which he told Litronic's man, Lair, that he was accepting the offer up to the limit of his authority, which was $24,999, and that a formal purchase order for all four boards would follow. Litronic was familiar with Northrop's purchase order form, having previously done business

with Northrop, which had been using the same form for some time. Had Lair referred to any of the previous orders, he would have discovered that Northrop's order form provided for a warranty that contained no time limit.

Lynch followed up the phone conversation a month later with a "turn on" letter, authorizing Litronic to begin production of all four boards (it had done so already) and repeating that a purchase order would follow. The record is unclear when the actual purchase order was mailed; it may have been as much as four months after the phone conversation and three months after the turn-on letter. The purchase order required the seller to send a written acknowledgment to Northrop. Litronic never did so, however, and Northrop did not complain; it does not bother to follow up on its requirement of a signed acknowledgment.

Although Litronic had begun manufacturing the boards immediately after the telephone call from Lynch, for reasons that are unknown but that Northrop does not contend are culpable Litronic did not deliver the first three boards until more than a year later, in July of 1988. Northrop tested the boards for conformity to its specifications. The testing was protracted, either because the boards were highly complex or because Northrop's inspectors were busy, or perhaps for both reasons. At all events it was not until December and January, five or six months after delivery, that Northrop returned the three boards (the fourth had not been delivered), claiming that they were defective. Litronic refused to accept the return of the boards, on the ground that its 90–day warranty had lapsed. Northrop's position of course is that it had an unlimited warranty, as stated in the purchase order.

As an original matter one might suppose that this dispute is not over the terms of the warranty but over whether Northrop waited more than the "reasonable time" that the Uniform Commercial Code allows the buyer of nonconforming goods to reject them. UCC § 2–602(1). That in fact is how the magistrate judge framed the issue, as we shall see. But the parties continue to treat it as a "warranty" case. Their implicit view is

that Litronic's 90–day warranty, if a term of the contract, not only barred Northrop from complaining about defects that showed up more than 90 days after the delivery of the boards but also limited to 90 days the time within which Northrop was permitted to reject the boards because of defects that rendered them nonconforming. We accept this view for purposes of deciding these appeals.

The parties have an unrelated dispute, over a different specification of printed wire boards, which Northrop claims were also defective. Northrop filed this suit to recover the money that it had paid for both types of board. The magistrate judge gave judgment for Northrop in the amount of $58,000, representing the money it had paid for the three No. 1714 boards that it had taken delivery of, but denied it recovery for the other boards on the ground that Northrop had failed to return them to Litronic. Both parties appeal.

■ Northrop in its appeal argues that it was entitled to retain the other boards as security for its claim of breach of contract. UCC § 2–711(3). The purchaser of defective goods by paying for them obtains a security interest, which he is entitled to enforce, as by reselling the goods in a reasonable manner and deducting his damages from the resale price, remitting the balance to the seller. § 2–711(1). The Code says resell or "hold" them, § 2–711(3), and if the goods are worthless, or (what is really the same thing) their storage costs or other costs of retention exceed their value, the buyer is free to throw them away without liability, *Smith v. Watson*, 406 N.W.2d 685 (N.D.1987); cf. UCC § 2–608 comment 6—and might in some cases even be required to do so, in order to mitigate his damages. See *Smith v. Watson*, *supra*, 406 N.W.2d at 688; cf. *Ford Motor Credit Co. v. Caiazzo*, 387 Pa.Super. 561, 564 A.2d 931, 935 n. 2 (App.1989); *Walter E. Heller & Co. v. Hammond Appliance Co.*, 29 N.J. 589, 151 A.2d 537, 539 (1959) (per curiam). But what he cannot do is fail to account for the goods, cf. UCC §§ 9–207, 9–506, as happened here.

■ Northrop's main argument at trial was that it *had* returned the boards, but the

magistrate judge disbelieved it and did not commit clear error in doing so. Northrop's trial brief asserted as an alternative argument that the company had not been required to return the boards; and when the magistrate judge found against Northrop on the question whether it had returned them, Northrop was entitled—having reserved the issue of whether it was required to return them—to base its appeal on the magistrate judge's finding. Entitled, that is to say, as a matter of ordinary principles of waiver. The doctrine of "mend the hold," which as we explained in *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir. 1990), is firmly grounded in Illinois law, limits the right of a party to a contract to change its position in the course of litigation. The precise scope of the doctrine, and the extent to which its application in a federal diversity suit is compatible with the principle that the procedures in such a suit are governed by federal rather than state law, are, as we discussed in the *Harbor* case, vexing and unsettled questions. No matter. Even if the doctrine is inapplicable, and even though Northrop was not required to return the goods, it cannot prevail in its appeal. If the buyer does not return the defective goods, it must explain why (that it sold them, or that they were unsalable, or whatever), to scotch any inference that it is seeking a double recovery. For suppose Northrop had resold the boards at a price equal to what it had paid for them. Then it would not be entitled to any damages, for it would not have sustained any loss. For aught that appears this is what happened; or at least Northrop's failure to offer an explanation of what happened to the boards precludes its denying in this court that it sold or otherwise disposed of them to its advantage. Maybe it used them in some other product.

Litronic's appeal concerns the breach of its warranty on the No. 1714 boards. It wins if the warranty really did expire after only 90 days. The parties agree that Litronic's offer to sell the No. 1714 boards to Northrop, the offer made in response to Northrop's request for bids, was—the offer. So far, so good. If Northrop's Mr. Lynch accepted the offer over the phone, the parties had a contract then and there, but the question would still be on what terms. Regarding the first question, whether there was a contract, we may assume to begin with that the acceptance was sufficiently "definite" to satisfy the requirement of definiteness in section 2–207(1); after all, it impelled Litronic to begin production immediately, and there is no suggestion that it acted precipitately in doing so. We do not know whether Lynch in his conversation with Lair made acceptance of the complete contract expressly conditional on approval by Lynch's superiors at Northrop. We know that he had authority to contract only up to $24,999, but we do not know whether he told Lair what the exact limitation on his authority was or whether Litronic knew it without being told. It does not matter. The condition, if it was a condition, was satisfied and so drops out.

■ We do not think that Northrop's acceptance, via Lynch, of Litronic's offer could be thought conditional on Litronic's yielding to Northrop's demand for an open-ended warranty. For while Lynch's reference to the purchase order might have alerted Litronic to Northrop's desire for a warranty not limited to 90 days, Lynch did not purport to make the more extensive warranty a condition of acceptance. So the condition, if there was one, was not an express condition, as the cases insist it be. See, e.g., *McCarty v. Verson Allsteel Press Co.*, 89 Ill.App.3d 498, 44 Ill.Dec. 570, 579, 411 N.E.2d 936, 945 (1980); *Clifford–Jacobs Forging Co. v. Capital Engineering & Mfg. Co.*, 107 Ill.App.3d 29, 62 Ill.Dec. 785, 787, 437 N.E.2d 22, 24 (1982); *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir.1972); White & Summers, *supra*, at 39.

■ There was a contract, therefore; further, and, as we shall note, decisive, evidence being that the parties acted as if they had a contract—the boards were shipped and paid for. The question is then what the terms of the warranty in the contract were. Lynch's reference in the phone conversation to the forthcoming purchase order shows that Northrop's acceptance contained different terms from the offer, namely the discrepant terms in the purchase order, in particular the warranty—for it is plain that the Northrop war-

ranty was intended to be indefinite in length, so that, at least in the absence of some industry custom setting a limit on warranties that do not specify a duration (cf. UCC § 2–207, comments 4 and 5), a point not raised, any limitation on the length of the warranty in the offer would be a materially different term. *Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1577 (10th Cir.1984); cf. *Owens–Corning Fiberglas Corp. v. Sonic Development Corp.,* 546 F.Supp. 533, 538 (D.Kan. 1982). Of course the fact that Northrop preferred a longer warranty than Litronic was offering does not by itself establish that Northrop's acceptance contained different terms. But Lynch did not accept Litronic's offer and leave it at that. He said that he would issue a Northrop purchase order, and both he and Lair knew (or at least should have known) that the Northrop purchase order form contained a different warranty from Litronic's sale order form. And we have already said that Lynch did not, by his oral reference to the purchase order, condition Northrop's purchase on Litronic's agreeing to comply with all the terms in the purchase order form, given the courts' insistence that any such condition be explicit. (Judges are skeptical that even businesspeople read boilerplate, so they are reluctant, rightly or wrongly, to make a contract fail on the basis of a printed condition in a form contract.) But Lynch said enough to make clear to Lair that the acceptance contained different terms from the offer.

The Uniform Commercial Code, as we have said, does not say what the terms of the contract are if the offer and acceptance contain different terms, as distinct from cases in which the acceptance merely contains additional terms to those in the offer. The majority view is that the discrepant terms fall out and are replaced by a suitable UCC gap-filler. E.g., *Daitom, Inc. v. Pennwalt Corp., supra,* 741 F.2d at 1578–80; *St. Paul Structural Steel Co. v. ABI Contracting, Inc.,* 364 N.W.2d 83 (N.D.1985); *Challenge Machinery Co. v. Mattison Machine Works,* 138 Mich. App. 15, 359 N.W.2d 232, 236–38 (1984) (per curiam). The magistrate judge followed this approach and proceeded to section 2–309, which provides that nonconforming goods may be rejected within a "reasonable" time

(see also § 2–601(1)), and she held that the six months that Northrop took to reject Litronic's boards was a reasonable time because of the complexity of the required testing. The leading minority view is that the discrepant terms *in the acceptance* are to be ignored, *Valtrol, Inc. v. General Connectors Corp.,* 884 F.2d 149, 155 (4th Cir.1989); *Reaction Molding Technologies, Inc. v. General Electric Co.,* 588 F.Supp. 1280, 1289 (E.D.Pa. 1984), and that would give the palm to Litronic. Our own preferred view—the view that assimilates "different" to "additional," so that the terms in the offer prevail over the different terms in the acceptance only if the latter are materially different, has as yet been adopted by only one state, California. *Steiner v. Mobil Oil Corp.,* 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751, 759 n. 5 (1977). Under that view, as under what we are calling the "leading" minority view, the warranty in Litronic's offer, the 90–day warranty, was the contractual warranty, because the unlimited warranty contained in Northrop's acceptance was materially different.

Because Illinois in other UCC cases has tended to adopt majority rules, e.g., *Rebaque v. Forsythe Racing, Inc.,* 134 Ill. App.3d 778, 89 Ill.Dec. 595, 598, 480 N.E.2d 1338, 1341 (1985), and because the interest in the uniform nationwide application of the Code—an interest asserted in the Code itself (see § 1–102)—argues for nudging majority views, even if imperfect (but not downright bad), toward unanimity, we start with a presumption that Illinois, whose position we are trying to predict, would adopt the majority view. We do not find the presumption rebutted. The idea behind the majority view is that the presence of different terms in the acceptance suggests that the offeree didn't *really* accede to the offeror's terms, yet both parties wanted to contract, so why not find a neutral term to govern the dispute that has arisen between them? Of course the offeree may not have had any serious objection to the terms in the offer at the time of contracting; he may have mailed a boilerplated form without giving any thought to its contents or to its suitability for the particular contract in question. But it is just as likely that the discrepant terms *in the offer* itself were the

product of a thoughtless use of a boilerplate form rather than a considered condition of contracting. And if the offeror doesn't want to do business other than on the terms in the offer, he can protect himself by specifying that the offeree must accept all those terms for the parties to have a contract. UCC § 2–207(2)(a); *Tecumseh International Corp. v. City of Springfield,* 70 Ill.App.3d 101, 26 Ill.Dec. 745, 748, 388 N.E.2d 460, 463 (1979). Now as it happens Litronic did state in its offer that the terms in the offer "take precedence over terms and conditions of the buyer, unless specifically negotiated otherwise." But, for reasons that we do not and need not fathom, Litronic does not argue that this language conditioned the existence of the contract on Northrop's acceding to the 90–day warranty in the offer; any such argument is therefore waived.

It is true that the offeree likewise can protect himself by making his acceptance of the offer conditional on the offeror's acceding to any different terms in the acceptance. But so many acceptances are made over the phone by relatively junior employees, as in this case, that it may be unrealistic to expect offerees to protect themselves in this way. The offeror goes first and therefore has a little more time for careful specification of the terms on which he is willing to make a contract. What we are calling the leading minority view may tempt the offeror to spring a surprise on the offeree, hoping the latter won't read the fine print. Under the majority view, if the offeree tries to spring a surprise (the offeror can't, since his terms won't prevail if the acceptance contains different terms), the parties move to neutral ground; and the offeror can, we have suggested, more easily protect himself against being surprised than the offeree can protect *himself* against being surprised. The California rule dissolves all these problems, but has too little support to make it a plausible candidate for Illinois, or at least a plausible candidate for our guess as to Illinois's position.

■ There is a further wrinkle, however. The third subsection of section 2–207 provides that even if no contract is established under either of the first two subsections, it

may be established by the "conduct of the parties," and in that event (as subsection (3) expressly provides) the discrepant terms vanish and are replaced by UCC gap fillers. This may seem to make it impossible for the offeror to protect himself from being contractually bound by specifying that the acceptance must mirror his offer. But subsection (3) comes into play only when the parties have by their conduct manifested the existence of a contract, as where the offeror, having specified that the acceptance must mirror the offer yet having received an acceptance that deviates from the offer, nonetheless goes ahead and performs as if there were a contract. That is one way to interpret what happened here but it leads to the same result as applying subsection (2) interpreted as the majority of states do, so we need not consider it separately.

■ Given the intricacy of the No. 1714 boards, it is unlikely that Northrop would have acceded to a 90–day limitation on its warranty protection. Litronic at argument stressed that it is a much smaller firm, hence presumably unwilling to assume burdensome warranty obligations; but it is a curious suggestion that little fellows are more likely than big ones to get their way in negotiations between firms of disparate size. And Northrop actually got only half its way, though enough for victory here; for by virtue of accepting Litronic's offer without expressly conditioning its acceptance on Litronic's acceding to Northrop's terms, Northrop got not a warranty unlimited in duration, as its purchase order provides, but (pursuant to the majority understanding of UCC § 2–207(2)) a warranty of "reasonable" duration, courtesy the court. If special circumstances made a 90–day warranty reasonable, Litronic was free to argue for it in the district court.

■ On the view we take, the purchase order has no significance beyond showing that Northrop's acceptance contained (albeit by reference) different terms. The fact that Litronic never signed the order, and the fact that Northrop never called this omission to Litronic's attention, also drop out of the case, along with Northrop's argument that to enforce the 90–day limitation in Litronic's warranty would be unconscionable. But for fu-

ture reference we remind Northrop and companies like it that the defense of unconscionability was not invented to protect multi-billion dollar corporations against mistakes committed by their employees, and indeed has rarely succeeded outside the area of consumer contracts. *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 281 (7th Cir.1992); *Salt River Project Agricultural Improvement & Power District v. Westinghouse Electric Corp.,* 143 Ariz. 368, 694 P.2d 198, 204 (1984); White & Summers, *supra,* § 4–9.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the Court and that part of the principal opinion that determines that Illinois would adopt the majority approach to the "battle of the forms" of UCC § 2–207. This resolution is a principled approach to the dilemma faced by a federal court when, in the absence of any pronouncement by the state courts, it is required to determine the position of a state on the interpretation of a section of the Uniform Commercial Code. We have under those circumstances, every right to assume that the state courts would foster the shared interest of all states in the uniform interpretation of the Code. *See* UCC § 1–102. Here, moreover, there is evidence that Illinois, when called upon to interpret the Code, has followed the majority approach.

As I have on other similar occasions, I respectfully decline to express, by way of an opinion of this court, a view on whether the majority interpretation of § 2–207 is preferable to the other interpretations. Federal courts sitting in diversity must, from time to time, determine the content of state law in order to decide the cases before them. It is, however, the constitutional prerogative of the states to determine the course of their jurisprudence and, in my view, our respect for that prerogative counsels that we refrain from taking an *institutional* position as a court on such matters. The National Conference of Commissioners on Uniform State

Laws has appointed a drafting committee to revise Article 2 of the Uniform Commercial Code and that body is considering changes to § 2–207 with the hope that it will not only eliminate the "battle of the forms" but also make the section more responsive to the technological changes that are taking place in the manner in which commercial agreements are made. During that process, I am sure that the Commissioners welcome the perspective of all who have an expertise and interest in the question, and I would hope that my colleagues on the federal bench who have views on the matter would join all other members of the profession in the dialogue currently underway on the future shape of § 2–207. However, I believe that, as an institution, we should stay within the confines of our constitutional role and make the best "Erie guess"[1] that we can. The principal opinion adopts a principled approach to that task and I am pleased to join in its adoption.

1. *See* Dolores K. Sloviter, *A Federal Judge Views Jurisdiction through the Lens of Federalism,* 78 Va.L.Rev. 1671, 1679 (1992) (employing the term "Erie guess").