985 So.2d 1 (2007)
PAUL GOTTLIEB & CO., INC., Appellant,
v.
ALPS SOUTH CORPORATION, Appellee.
No. 2D06-3823.
District Court of Appeal of Florida, Second District.
December 21, 2007.
Rehearing Denied March 7, 2008.
*3 Brandon S. Vesely and Charles W. Gerdes of Keane, Reese, Vesely & Gerdes, P.A., St. Petersburg, for Appellant.
David M. Caldevilla, Ronald A. Christaldi and Kelly A. Zarzycki of de la Parte & Gilbert P.A., Tampa, for Appellee.
CASANUEVA, Judge.
Paul Gottlieb & Co., Inc. (Gottlieb) appeals a final judgment awarding damages to Alps South Corp. (Alps) on its claim for breach of warranty. Gottlieb contends that the trial court erred by awarding consequential damages because the contract between the parties included a limitation of liability clause or, alternatively, because consequential damages were inappropriate in this case and were not sufficiently established by competent proof. We agree with Gottlieb in part and therefore reverse and remand with directions to the trial court. We conclude that the trial court erred in its analysis that the limitation of liability clause materially altered the contract. However, we also conclude Gottlieb's undisputed breach of contract entitles Alps to seek certain benefit-of-the-bargain damages that flow directly and incidentally from Gottlieb's breach under provisions of the Florida Uniform Commercial Code (U.C.C.). Accordingly, we remand the case to the circuit court to hold a new hearing on the limited question of the amount of damages only.

I. FACTUAL BACKGROUND
Gottlieb is a fabric converter based in New York City. Gottlieb supplies its customers specialty knitted fabrics that are shipped directly from third-party knitting and finishing mills. Alps is a manufacturer of medical devices located in St. Petersburg, Florida. Alps produces various types of liners that amputees use to attach prosthetic devices. In January 2000, Alps used liners that consisted of a specially designed gel material covered in spandex fabric that stretched to allow the liner to be placed over the appendage and then compressed to provide stability.
Alps began testing a number of new fabrics in February 2000 hoping to develop a new product possessed of enhanced durability and stability. Gottlieb was a source of the new fabrics. After some initial testing, Alps settled on a specialty fabric provided by Gottlieb identified as TL2646 Coolmax[1] fabric which outperformed the other fabrics. Alps began incorporating the new fabric into its liners. Alps received positive feedback from its customers that the new liners had increased comfort. The commercial relationship between Alps and Gottlieb started out in a promising fashion.
Unfortunately, six months later, in August 2000, the relationship began showing signs of a downturn. Alps rejected some fabric samples Gottlieb submitted because of unacceptable inconsistencies in both color and texture. On August 29, 2000, Alps sent a letter promptly notifying Gottlieb of the product deficiencies and stating that any future commercial relationship mandated that Gottlieb provide a more consistent product. However, the letter did not *4 inform Gottlieb of the possibility that Alps could incur substantial additional costs as a result of using a different fabric. Also Alps did not disclose the specialized use of the fabric to Gottlieb.[2] Gottlieb agreed to rework the fabric before delivering it to Alps.
Later events resulted in a worsening of the situation. Gottlieb exhausted its supply of the yarn used to produce the specialized high-tech fabric. It substituted a similar, but not identical, yarn without notifying Alps of the substitution.[3] The trial court found this substitution caused a defect that was not easily discoverable by Alps. The new fabric did not stretch nearly as well as the original fabric that had been designated, tested, and approved by Alps. In early December of that same year, Alps began receiving complaints from customers that the fabric in the liners was less comfortable. The problems were so severe that Alps recalled the liners it had placed on the market and destroyed the devices in its inventory.
When Alps and Gottlieb discovered that the cause of the defective products was the undisclosed substitute yarn, the parties' business relationship further deteriorated. The business relationship ended when Gottlieb failed to receive payment for a submitted bill. Gottlieb then brought an action to collect damages due to the nonpayment. In turn, Alps counterclaimed for damages it asserted were caused by Gottlieb's breach of warranty. Of importance to the damage claim is the language set forth on the back of Gottlieb's finished goods contract which purports to limit its liability. The trial court ultimately considered this language to be an affirmative defense to the counterclaim.
Following a nonjury trial, the trial court awarded damages to Gottlieb on its claim totaling $28,846.29; awarded damages to Alps on its counterclaim of $694,640.04; and determined that under Florida's U.C.C. provisions, the limitation of liability clause was a material alteration of the parties' contract. The trial court declined to enforce the provision concluding that by operation of law, it was not a part of the contract.

II. LIMITATION OF LIABILITY CLAUSE
This dispute arises from the common, but risky, commercial practice where the seller and buyer negotiate a contract involving goods by exchanging each others' standardized forms. The transactions of this type involved here are governed by section 2-207 of the U.C.C., codified in section 672.207, Florida Statutes (2000).
Here, Gottlieb first contends that the trial court erred by failing to enforce the limitation of liabilities clause found on the back of its finished goods contract. The clause in contention reads:
BUYER SHALL NOT IN ANY EVENT BE ENTITLED TO, AND SELLER SHALL NOT BE LIABLE FOR INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY NATURE, INCLUDING, WITHOUT BEING LIMITED TO, LOSS OF PROFIT, PROMOTIONAL OR MANUFACTURING EXPENSES, INJURY TO REPUTATION OR LOSS OF CUSTOMER.
*5 In its analysis, the trial court determined the clause constituted a material alteration under section 672.207(2) and as such it did not become part of the contract. In reaching this conclusion, the trial court determined that were it given effect, the limitation of liability "would allow Gottlieb to substitute a product without notice to Alps that would affect the final marketability of the final product." We do not apply the same reasoning as the trial court. The fact that Gottlieb altered a yarn type that resulted in a breach of contract is separate and distinct from the legal analysis of how the language of the contract is construed. In other words, the cause of the breach, the substituted yarn, is a question of fact which the parties did not dispute. Therefore, the trial court only needed to determine whether the clause, as a matter of law, materially altered the contract. Since this is a pure question of law, we review the trial court's conclusion de novo. Am. Strategic Ins. Co. v. Lucas-Solomon, 927 So.2d 184 (Fla. 2d DCA 2006).

A. Preservation
Before reaching the merits of this issue, we first determine whether it has been properly preserved for appeal. Alps correctly contends that Gottlieb failed to raise the limitation of liability clause as an affirmative defense in its response to the second amended complaint, although it had done so previously. Therefore, Alps asserts the issue has been waived and is not preserved for our review.
We agree with Alps that affirmative defenses must be pleaded either in the answer or as separate affirmative defenses and, if not pleaded, the issue is deemed waived. See Fla. R. Civ. P. 1.140(h)(1). There is, however, an exception to this general rule. It is well recognized that an affirmative defense can be tried by consent. See Smith v. Mogelvang, 432 So.2d 119, 122 (Fla. 2d DCA 1983); Book v. City of Winter Park, 718 So.2d 945, 947 (Fla. 5th DCA 1998); Narus v. Narus, 382 So.2d 144, 146 (Fla. 4th DCA 1980). An issue tried by consent is treated as though it had been raised in the pleadings. Fla. R. Civ. P. 1.190(b). Therefore, we must determine whether this issue was preserved because it was tried by consent of the parties.
"An issue is tried by consent when there is no objection to the introduction of evidence on that issue unless the evidence is relevant to other, properly pled issues." Book, 718 So.2d at 947 (internal citations omitted). In the instant case, the parties raised the issue in trial briefs, introduced evidence relating to the issue during trial, and argued its merits during closing argument. At no point did Alps object to the introduction of this issue as being beyond the scope of the original pleadings. Additionally, the trial court determined the issue was before it and ruled on its merits. For these reasons we determine the issue was tried by consent, preserved, and is properly before us on review.

B. The Battle of the Forms
We next determine whether the trial court erred by failing to enforce the limitation of liability clause. For the following reasons, we conclude the trial court erred.
"[T]he rules of engagement for the `battle of the forms' are set out in the Uniform Commercial Code (`U.C.C.'), s. 2-207." Bayway Ref. Co. v. Oxygenated Mktg. & Trading, 215 F.3d 219, 223 (2d Cir.2000). The same rules of engagement apply in Florida and are codified in section 672.207. Subsections (1) and (2) of the statute are intended, according to the Florida Code Comments provided with the 1965 Enactment, to end the battle by eliminating the uncertainty that often results from the exchange of conflicting purchase order forms *6 and acknowledgement and acceptance forms. The battle lines are frequently created where, as here, "the seller's form contains terms different from or additional to those set forth in the buyer's form." Official Comment 1 § 672.207. Despite the differences in the forms, the parties proceed with the commercial transactions and fight the battle after the transaction concludes.
Initially, section 672.207(1) provides that, between merchants, where a "definite and seasonable expression of acceptance or a written confirmation is sent within a reasonable time," it operates as "an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."
Having determined when or how the offer is deemed accepted, the statute next seeks to determine whether the additional term or terms are treated as a part of a legally enforceable contract. Subsection 672.207(2) provides:
The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;
(b) They materially alter it; or
(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
(Emphasis provided.)
These statutory provisions allow the formation of a contract where an acceptance contains additional or different terms than the original offer. While such an acceptance ordinarily would not meet the strict requirements of the common law mirror image rule, the U.C.C. provides a more flexible approach. Under section 672.207(2), additional terms included in an acceptance are construed as proposals for addition to the contract. See A & M Eng'g Plastics, Inc. v. Energy Saving Tech. Co., 455 So.2d 1124 (Fla. 4th DCA 1984). Between merchants, the terms become part of the contract unless they fall into an exception. § 672.207(2). Within the context of section 672.207(2), the parties do not dispute that they are merchants, that Gottlieb's offer did not expressly limit acceptance to its terms, and that Alps did not object to the additional terms within a reasonable amount of time. The remaining issue is whether the limitation of damages clause, as an additional term, materially altered the contract. If the additional term materially alters the contract, it is excluded.
Procedurally, in determining whether a term constitutes a material alteration, other courts have placed the burden of proof upon the party seeking the term's exclusion. See Bayway, 215 F.3d at 223-24; JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47 (1st Cir.1999); Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279 (10th Cir.1997); Comark Merch., Inc. v. Highland Group, Inc., 932 F.2d 1196 (7th Cir. 1991); but see Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190 (Tex.App.1992). We conclude that this rule is appropriate and hold that a party seeking the exclusion of a contractual term or provision pursuant to section 672.207(2), as constituting a material alteration, has the burden of proof. In doing so, we align this court with the great majority of this nation's courts. Cf. Courington v. Courington, 120 So.2d 64 (Fla. 2d DCA 1960) (holding that a party seeking to set aside a bill of sale on grounds of fraud and undue influence has the burden of proof).

*7 C. Surprise or Hardship
Having determined which party appropriately bears the burden of proof, we next address the nature of proof that a party must offer to meet its burden. Unfortunately, the law in this area is not yet clearly developed. For example, Official Comment 4 to U.C.C. § 2-207 offers examples of "typical clauses which would normally `materially alter' the contract" and that would "result in surprise or hardship if incorporated without express awareness by the other party." For other examples, see Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901 (8th Cir.2005); Coastal Indus., Inc. v. Automatic Steam Prod. Corp., 654 F.2d 375 (5th Cir.1981); Dale R. Horning Co. v. Falconer Glass Indus., Inc., 730 F.Supp. 962 (S.D.Ind.1990).
In contrast, Official Comment 5 to U.C.C. § 2-207 offers "[e]xamples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given." (Emphasis added.) Relying on this language and common law principles, some courts have removed hardship from the analysis and look solely for surprise. See Union Carbide Corp. v. Oscar Mayer Foods Corp., 947 F.2d 1333 (7th Cir.1991); Suzy Phillips Originals, Inc. v. Coville, Inc., 939 F.Supp. 1012 (E.D.N.Y.1996). Previously, this court considered whether a term was a material alteration under section 672.207 in Advanced Mobilehome Systems of Tampa, Inc. v. Alumax Fabricated Products, Inc., 666 So.2d 166 (Fla. 2d DCA 1995), and approved of the rationale of Union Carbide to reach its decision (observing that a change is material if agreement to it cannot be presumed). There, Judge Posner explained:
What is expectable, hence unsurprising, is okay; what is unexpected, hence surprising, is not. Not infrequently the test is said to be "surprise or hardship," but this appears to be a misreading of Official Comment 4 to UCC § 2-207. The comment offers examples of "typical clauses which would normally `materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party" (emphasis added). Hardship is a consequence, not a criterion. (Surprise can be either.) You cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you, unless you can squeeze yourself into the impossibility defense or some related doctrine of excuse.
Union Carbide, 947 F.2d at 1336 (citations omitted). Today, we continue to follow this rationale.
Turning first to the surprise prong, Alps must prove "that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term." See Bayway Refining, 215 F.3d at 224. The finished goods contract at issue was the sixth in a series between the two parties and each contract included the limitation of liability term. Each proposed contract contained the terms which were visible on its face. The sole evidence presented at trial to establish surprise was that Alps had not read the contract before the dispute arose. Florida law has never excused a party from a contract simply because it failed to read the contract terms. See Allied Van Lines, Inc. v. Bratton, 351 So.2d 344 (Fla.1977); Kinko's, Inc. v. Payne, 901 So.2d 354 (Fla. 2d DCA 2005). Additionally, Official Comment 5 to UCC § 2-207 includes clauses which limit remedies in a reasonable manner among the examples of terms which do not involve unreasonable surprise. The record in this *8 case does not allow a conclusion that Gottlieb's limitation of liability clause was an unreasonable surprise to Alps.
The record is similarly lacking with respect to hardship as a result of surprise. Courts that consider hardship look to whether the term would "impose substantial economic hardship on the non-assenting party." Horning, 730 F.Supp. at 962 (quoting Trans-Aire Int'l, Inc. v. N. Adhesive Co., Inc., 882 F.2d 1254 (7th Cir. 1989).) The Horning court reviewed a clause that provided "the buyer's exclusive and sole remedy for defective goods shall be to secure replacement." Id. at 963. In that case, the supplier was aware that the buyer could incur substantial liability if a breach occurred. Id. at 967. Further, the supplier's actions, in offering to work with the buyer, caused the buyer to believe that its costs would be reimbursed because of the breach. Id. at 963-64. The Horning court concluded that "[i]n this situation, where [the supplier] knew or had reason to know that [the buyer] could incur substantial liability for delays in finishing its subcontract, there can be no doubt that a limitation of consequential damages would work a hardship on the buyer." Id. at 963.
Here, the facts do not permit a result identical to that of Horning. Gottlieb never represented that, in the event of a breach, it would reimburse Alps for any or all consequential damages it sustained resulting from the breach. Instead, the evidence showed that Alps previously had returned a sample of nonconforming fabric to Gottlieb with a letter insisting on conforming goods. This letter did not mention or make claim for additional costs or damages resulting from Gottlieb's prior breach of performance. The evidence shows that Alps never informed Gottlieb of any consequences other than discontinuing their relationship. Alps did not inform Gottlieb of the specific manner in which the subject fabric would be used or what product would be crafted. Thus, Gottlieb could not foresee the greater extent of its potential liability, should a subsequent breach occur. Because Alps neglected to inform Gottlieb of the larger consequences of the breach, we conclude that Alps cannot maintain that incorporating the limitation of liability clause would result in a severe economic hardship. Thus, Alps failed to carry the burden of proof on hardship.
For these reasons, we conclude that the trial court erred by not enforcing the limitation of consequential damages clause. The award of consequential damages must be stricken.
Finally, we note that enforcing of the clause at issue only bars consequential damages.[4] The limitation in this clause does not exclude other damages available under the law. See § 672.719; Council Bros., Inc. v. Ray Burner Co., 473 F.2d 400 (5th Cir.1973) (interpreting Florida law). We observe that section 671.106(1), Florida Statutes (2000), suggests that an injured party should not be worse off because the other party breached:
The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good as a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.
Thus, Alps is still able to recover some of its direct and incidental damages, although it is precluded from receiving consequential damages. See § 672.714-.715. Comment (a) of the Restatement of Contracts *9 (Second) section 347 echoes this sentiment in that expectation damages are intended to give the injured party "the benefit of his bargain by putting him in as good as a position as he would have been had the contract been performed." The code also provides for incidental damages arising from the breach. These "include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." § 672.715(1). Therefore, the trial court may award Alps its direct and incidental damages. See Adam Metal Supply, Inc. v. Electrodex, Inc., 386 So.2d 1316 (Fla. 2d DCA 1980) (holding a buyer's expenses incurred before discovering a defect are recoverable as incidental damages).

III. LOST PROFITS
Although our holding enforces the limitation of liability clause which barred lost profits, we alternatively hold it was also error to award Alps damages for lost profits because Alps failed to prove them with reasonable certainty. Florida law allows for the award of consequential damages. See §§ 672.714-715; Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936). However, lost profits "must be proven with a reasonable degree of certainty before [the loss] is recoverable." Shadow Lakes, Inc. v. Cudlipp Constr. Dev. Co., 658 So.2d 116, 117 (Fla. 2d DCA 1995). "The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." Id.
In the instant case, Alps failed to carry its burden of proving lost profits with reasonable certainty. Alps introduced evidence proving it destroyed 4249 of its defective liner devices. To reach the total lost profit award of $633,939.04, the trial court granted lost profits for each device destroyed. This award is improper because it merely reflected the units that were in Alps' inventory  it was not based on relevant marketplace considerations including, but not limited to, data on open orders that could not be immediately filled.
For example, Alps established that it recalled 682 of the destroyed devices from the marketplace. However, Alps did not issue cash refunds; instead, it provided customers a credit which enabled the customers to receive a sleeve free of the defect. Additionally, 3567 of the destroyed devices came from Alps' inventory.
The voluminous record and numerous exhibits reflect that Alps had substantial costs associated with the production of its liners. The liners contained other high-tech materials the assembly of which required skilled labor and specialized equipment. Although the trial court awarded costs of production, the figure was generally characterized as "Alps claims damages of $694,640 for the cost of production and lost profit for the product that was returned and stock in inventory that was destroyed." There were no specific findings of the amount of either lost profits or production. Alps did not seek damages for loss of market share or goodwill although there was testimony by Dr. Aldo Laghi, Ph.D., president of Alps, that the loss of sales almost drove the company out of business. The evidence presented yields only a speculation that profits were lost, and this is insufficient to justify the award of lost profits.

IV. INSTRUCTIONS ON REMAND
Although we find that Alps did not prove lost profits with reasonable certainty, we do recognize that Alps' damages under the UCC came into existence at the moment Gottlieb delivered the fabric containing the *10 unapproved yarn. This deficiency was neither obvious nor discoverable until after Alps had incorporated the fabric into its product line investing time, labor, and materials in the finished products. As a merchant, Gottlieb is expected to know that direct and incidental damages could flow from a delivery of unapproved goods. Due to the limitation of liability clause, Gottlieb properly insulated itself from consequential damages, but it cannot shield itself from the direct and incidental damages naturally arising from the undisputed breach. We note again that the contract between the parties dealt only with supplying a specific and highly technical fabric made of a particular yarn combination. Gottlieb should have consulted with Alps prior to making a change in the yarn. However, Gottlieb did not notify Alps that it substituted an unapproved yarn for the earlier specified yarn. A clear nexus between the breach by Gottlieb and the injury to Alps exists. Accordingly, we leave open the possibility of more specific findings by the trial court as it revisits the issue of damages, including Gottlieb's familiarity with Alps' product requirements, the common trade practices and course of dealings in the fabric industry, the nature of Alps' inventory and its cost to recover the defective items, and any other indicia of Alps' loss or Alps' ability to mitigate such loss that the trial court may find helpful.

V. CONCLUSION
We hold that the trial court erred in awarding Alps consequential damages. We reverse and remand with instructions to strike the consequential damages and lost profits awards and order the circuit court to hold a hearing on the limited question of damages only. As outlined above, these damages include incidental and certain benefit-of-the-bargain (direct) damages stemming from Gottlieb's undisputed breach.
Reversed and remanded with instructions.
NORTHCUTT and SALCINES, JJ., Concur.
NOTES
[1] The TL2646 Coolmax fabric in question is the sole item of the contract between Gottlieb and Alps. Coolmax is a technologically advanced yarn developed by DuPont that is often used in athletic performance clothing because of its unique dimensions, shape, and wicking properties.
[2] The record reflects Gottlieb was not aware of Alps' specific use of the fabric in a prosthetic device. However, this letter and additional communications between the parties indicates that Gottlieb knew the fabric needed to conform to the original sample.
[3] The TL2646 Coolmax fabric was actually knitted by Beverly Knits, Inc., of Gastonia, North Carolina, a subcontractor to Gottlieb. The trial court discussed the breach in terms of the approved yarn as T-935 and the substitute yarn as T-56.
[4] Gottlieb advocated this interpretation in its trial brief, stating "[b]y its plain meaning, this language only bars consequential damages claims."