REYNOLDS METALS COMPANY,
Plaintiff,

v.

FMALI, INC., Defendant.

Civ. A. No. 3:94cv413.

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 26, 1994.

Charles Manley Allen, Jr., David Ernest Boelzner, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, VA, for plaintiff.

Robert Steven Holt, William R. Pendergast, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case comes before the Court on the motion of FMALI, Inc. ("FMALI") to dismiss this action or, alternatively, to transfer it to California. Reynolds Metals Company ("Reynolds") complains that FMALI has failed to pay for certain packaging as contractually obligated, and it asserts that FMALI is subject to personal jurisdiction in Virginia. FMALI is a family-owned California corporation with its principal place of business in California; and Reynolds is a Delaware corporation with its principal place of business in Virginia.

The parties' contractual obligations stem from two contracts for Reynolds to manufac-

ture and deliver to FMALI packaging for FMALI's Good Earth brand of herbal teas. The first contract, Supply Agreement 6433 ("SA 6433"), was executed on December 21, 1993. The second contract, Supply Agreement 6441 ("SA 6441"), was executed on May 4, 1994, after it was discovered that the packaging called for by SA 6433 was contaminating the teas. On the jurisdiction and venue issues, FMALI claims that, in negotiating SA 6433, it dealt only minimally with Reynolds employees in Richmond, Virginia, and that it was unaware the packaging would be manufactured in Richmond. Finding this argument unpersuasive, the court denies the Defendant's motion to dismiss and, moreover, defers to the Plaintiff's choice of venue.

## STATEMENT OF FACTS

The parties' relationship began in 1992 when Reynolds personnel residing in California offered to supply FMALI with packaging for its teas at a price lower than that asked by FMALI's then-current supplier. Before execution of SA 6433, FMALI employees in California communicated with Reynolds employees in California, Texas, Arizona, and Virginia, but no FMALI employee ever travelled to Virginia for these or any subsequent communications with Reynolds. FMALI contends that its communications by telephone and telefax with Virginia were not negotiations, but only exchanges of technical information.

In April of 1993 and by agreement of the parties, Reynolds forwarded from Richmond a small pilot run of packaging. Following FMALI's approval of the pilot run and with its consent, Reynolds shipped from Richmond a limited plant run of two million pieces in November of 1993. A few weeks later, the parties agreed to terms and a contract was drafted. On December 16, a Reynolds representative in Richmond became the first to sign SA 6433, and then, after it was delivered to California, the document was finally executed by a FMALI representative in Santa Cruz on December 21.

The relationship contemplated by the parties' agreement was a significant one. The contract was essentially a two-year requirements contract to begin January 1, 1994, and it estimated the annual volume at 80 million packages—a lot of tea. Prices were set as a function of the volume ordered at one time. The contract evidences some connection with Virginia on its face. The SA 6433 document itself has Reynolds's Richmond address in the heading, but it does not specifically state that the packaging would be manufactured in Richmond. It does, however, call for Virginia law to govern all aspects of the contract. On the other hand, the parties agreed that delivery would be made "F.O.B. Destination [California]," and in the course of performance, Reynolds asked that all payments be made to a bank in California.

Performance under SA 6433 and negotiations leading to SA 6441 involved more contact with Virginia. In February of 1994, Reynolds produced in Richmond and delivered to California about thirty million packages. Although apparently neither party had suspected a problem, some of FMALI's customers began noticing a bad taste in Good Earth Tea. FMALI's testing revealed that the Reynolds packaging was contaminating the tea, and it refused to pay for most of the packages. Both parties wanted or needed to continue their relationship; so discussions between the two parties from March to May of 1994 led to SA 6441, essentially replacing SA 6433 and calling for a different type of packaging, a lower volume, and a higher price. The Reynolds representatives involved in most of these discussions were in Richmond. The second supply agreement's appearance and manner of execution were very similar to those of the first. In particular, Reynolds's Richmond address was still in the heading; Virginia law was still invoked; and it was again signed first in Richmond, then forwarded to California for a FMALI representative's signature. Under SA 6441, FMALI has accepted at least 30 million packages.

## DISCUSSION

### A. The Basic Law Of Personal Jurisdiction

█ In considering a challenge to personal jurisdiction, the plaintiff has the burden of establishing jurisdiction by a preponderance

of the evidence. *See Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989); *Verosol B.V. v. Hunter Douglas, Inc.,* 806 F.Supp. 582, 588 (E.D.Va.1992). The plaintiff is entitled, however, to favorable inferences from the pleadings, affidavits, and documents submitted on the issue. *See Combs,* 886 F.2d at 676; *Verosol,* 806 F.Supp. at 588.

Reynolds must prove both that FMALI falls within Virginia's long-arm statute, Va. Code Ann. § 8.01–328.1 (Michie 1992), and that the exercise of personal jurisdiction will not violate the Due Process Clause of the Fourteenth Amendment. *Verosol,* 806 F.Supp. at 589. Although this is the traditional way of framing the two-prong inquiry, only the second prong requires consideration because the Supreme Court of Virginia has held that the Virginia long-arm statute extends personal jurisdiction to the full extent permitted by due process. *See Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982); *Superfos Investments v. FirstMiss Fertilizer,* 774 F.Supp. 393, 397 (E.D.Va.1991).

██ Reynolds limits the issue still further by asserting only the theory of specific jurisdiction and not pursuing the theory of general jurisdiction. Plaintiff's Response in Opposition to Defendant's Motion to Dismiss, at 27–28 n. 8. Personal jurisdiction exists "specifically" if the instant controversy "arises out of" sufficient contacts with Virginia; it would exist "generally" where a defendant had sufficient "continuous and systematic" contacts to permit the courts of the forum fairly to exercise personal jurisdiction no matter what the controversy. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Not surprisingly, then, "[a] less strict standard applies to specific jurisdiction." *Superfos Investments,* 774 F.Supp. at 397.

## B. Personal Jurisdiction Law Applied "Specifically"

The "essential foundation" of specific jurisdiction is a "relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579–80, 53 L.Ed.2d 683 (1977). In evaluating this relationship here, the court looks to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985). Thus, the court must analyze FMALI's relationship with Virginia in light of the supply agreements giving rise to this litigation.

The Supreme Court confronted a similar task in *Burger King,* primarily a breach of contract case. There, Burger King, a Florida corporation with its principal offices in Florida, invoked the jurisdiction of Florida courts over Mr. Rudzewicz, a Michigan resident who had partly owned a Burger King franchise in Michigan. Burger King complained that Rudzewicz and his partner had failed to make payments required by the franchise contract and that the two partners were tortiously infringing its trademarks by continuing the franchise after Burger King had terminated it. *Id.* at 464–69, 105 S.Ct. at 2177–80. Finding that the exercise of jurisdiction was proper, the Supreme Court summarized its reasoning this way:

> Because Rudzewicz established a substantial and continuing relationship with Burger King's Miami headquarters, received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and has failed to demonstrate how jurisdiction in that forum would otherwise be fundamentally unfair, we conclude that the District Court's exercise of jurisdiction ... did not offend due process.

*Id.* at 487, 105 S.Ct. at 2190.

### 1. *Relationship With Reynolds In Richmond*

██ Essentially the same can be said in this case. First, FMALI established a "substantial and continuing" relationship with Reynolds in Richmond. Reynolds was apparently to be the sole FMALI supplier of tea packaging for two years, and FMALI had reason to know Reynolds would be manufacturing the packages in Richmond. FMALI admits it communicated technical and delivery information to Richmond during negotia-

tions. Also, it could easily tell that the contract was forwarded to California from Richmond, and it could see the Richmond address in the heading of the document itself. Finally, the pilot and plant runs in April and November of 1993 came from Richmond. FMALI employees may have believed that Reynolds's decisions were made primarily in California and Texas, *see* Declaration of Ben Zaricor, ¶ 4 (attached to Defendant's Reply Memorandum), but this does not eliminate the rather substantial Virginia connection, of which FMALI had reason to know, with the supply agreement. Indeed, in *Burger King*, Rudzewicz argued, and the Eleventh Circuit agreed, that "in light of the supervision emanating from Burger King's district office in [Michigan], Rudzewicz reasonably believed that 'the Michigan office was for all intents and purposes the embodiment of Burger King' and that he therefore had 'no reason to anticipate a Burger King suit outside of Michigan.'" *Burger King*, 471 U.S. at 480, 105 S.Ct. at 2186. The Supreme Court found that this reasoning ignored the relationship with Florida that existed apart from the role played by the Michigan office. Similarly, FMALI cannot credibly argue that the prominent role played by Reynolds employees in Texas and California made the offices there the "embodiment" of the Richmond manufacturing facility.

The relationship between FMALI and Reynolds contrasts with the relationship between the plaintiff and defendant in two Fourth Circuit cases finding an insufficient nexus to warrant the exercise of jurisdiction: *Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474 (4th Cir.1993); and *Chung v. NANA Development Corp.*, 783 F.2d 1124 (4th Cir.), *cert. denied*, 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986). The Court of Appeals in *Ellicott* explicitly distinguished the parties' relationship from Burger King's relationship with Rudzewicz. The Fourth Circuit found that the defendant "did not contemplate a long-term relationship with 'continuing and wide-reaching contacts'" with the plaintiff in the forum, Maryland. *Ellicott*, 995 F.2d at 478. It noted that the contract for assembly of a dredge in Australia was completed by the Australian defendant in four months, and no future con-

tracts with the Maryland plaintiff were planned. *Id.* Given the lack of other contacts with Maryland, this relationship between the parties was insufficient to support jurisdiction. In *Chung*, where a defendant seller's goods spoiled en route to the plaintiff buyer, the Alaska defendant engaged in only one transaction-selling 500 pounds of reindeer antlers (and shipping to Virginia 380 of those 500 pounds)—with the Virginia plaintiff. *Chung*, 783 F.2d at 1125–26, 1128. And the shipment to Virginia was an "isolated occasion," necessary only because 380 pounds of antlers were not ready for tender to the plaintiff in Alaska at the designated time. *Id.* at 1128. Interestingly, even the weak relationship with Virginia in *Chung* persuaded one judge that Virginia could constitutionally exercise jurisdiction. *Id.* at 1130 (Ervin, J., dissenting). Given the significance of the parties' relationship in the instant case, the proper resolution is more apparent here.

### 2. *Fair Notice*

FMALI also "received fair notice from the contract documents and the course of dealing" that litigation was possible in Virginia. Reynolds shipped millions of packages in February of 1994, and there is no evidence that Reynolds concealed the shipment's origin, Richmond. After discovering a problem with the goods, FMALI negotiated for SA 6441 without requesting that Reynolds use its Pennsylvania facility, the only other Reynolds facility capable of manufacturing these packages. Still, FMALI representatives looked primarily to Reynolds employees in California and Texas to resolve the problem, but Reynolds in Virginia became heavily involved. Thereafter, under the new agreement, FMALI again received millions of packages and is due to receive millions more from Richmond.

While it is true that a defendant should not "be haled into a jurisdiction solely as a result ... of the 'unilateral activity of another party,'" *id.* 471 U.S. at 2183, 105 S.Ct. at 475 (quoting *Helicopteros*, 466 U.S. at 417, 104 S.Ct. at 1873), a defendant likewise should not be able to establish immunity from jurisdiction by blinding itself to a relationship it has created and sustained with a forum. *See*

*Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84 (requiring that " 'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State,' " and finding that "where the defendant 'deliberately' ... has created 'continuing obligations' between himself and residents of the forum, ... he manifestly has availed himself of the privilege of conducting business there ...") (citations omitted). Granted, FMALI was not making payments into the forum as Rudzewicz was, but the place of payment did not determine the resolution of *Burger King.* The Supreme Court stressed that Rudzewicz was willing to negotiate and enter a long-term (twenty-year) contract with a Florida corporation and that he could foresee the harm in Florida stemming from refusal to pay Burger King and to cease using its trademarks. *Id.* at 480, 105 S.Ct. at 2186. Given that Reynolds has its principal office in Virginia and manufactured the packages in Virginia, harm in Virginia was likewise foreseeable in this case. Moreover, the relationship here, originally expected to last at least two years and involve over a million dollars in goods, was also substantial, as explained above.

There is one final strong connection with the forum in this case and *Burger King:* the contractual invocation of forum law. *See id.* at 482, 105 S.Ct. at 2187 (finding that the contractual choice of Florida law "reinforced" Rudzewicz's "deliberate affiliation" with that state and "the reasonable foreseeability of possible litigation there").

The Fourth Circuit provided some insight to the *Burger King* considerations when it distinguished the facts in that case from those in *Ellicott.* Finding jurisdiction improper in *Ellicott,* the Fourth Circuit, after citing Rudzewicz's contacts with Florida in *Burger King,* cited the substantial absence of contacts with the Maryland forum in the case before it: the contract was to be performed, not in Maryland, but in Australia; the parties' relationship did not exceed one four-month contractual relationship; and the only reference to controlling law in the contract stated " '[a]ll work to be accomplished ... consistent with Australian statutes and regulations.' " *Ellicott,* 995 F.2d at 478. Juxta-

posing the facts in *Burger King* with those in *Ellicott,* then, the court finds the instant controversy much more similar to the case finding personal jurisdiction could be constitutionally exercised.

The facts establishing fair notice here are remarkably analogous to those in *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). In that breach-of-insurance-contract case, as well as here, the defendant never had an office or agent in the forum, nor did it do any business other than that giving rise to the controversy. *Id.* at 222, 78 S.Ct. at 200–01. Where the out-of-state insurer refused to pay the beneficiary of an in-state decedent's life insurance policy, the *McGee* Court found it sufficient "that the suit was based on a contract which had a substantial connection with" the forum state. It reasoned that "the premiums were mailed from [the forum] and the insured was a resident of that State when he died. It cannot be denied that [the forum state] has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *Id.* at 223, 78 S.Ct. at 201. In precisely the same way, Reynolds manufactured and shipped packages from the forum; it has its principal place of business there; and Virginia is interested when its businesses are not paid for their goods.

### 3. *Fundamental Fairness*

Finally, jurisdiction in Virginia would not be "fundamentally unfair." Exercise of personal jurisdiction must comport with "fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). The Supreme Court in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980), listed factors a court might consider to ensure such fairness. Included in the list are 1) the burden on the defendant, 2) the plaintiff's interest in obtaining convenient and effective relief, and 3) the forum state's interest in adjudicating the dispute.

If this court analyzed these factors intending to identify the ideal forum, California might emerge the victor. After all, FMALI

is much smaller than Reynolds and all of its employees, and even its shareholders, reside in California. Reynolds, by contrast, is a much larger corporation that can, presumably, more easily spare the time that some of its employees will miss as a result of travel associated with the litigation. Additionally, while Virginia has an interest in seeing that a corporation with principal offices in the state is paid for goods it manufactures in the state, California has a strong interest in seeing that a small California company is not required to pay for defective goods manufactured across the country. Lastly, FMALI may have more non-employee witnesses, with knowledge of the tea's bad taste, who cannot be compelled to travel thousands of miles to testify.

But this hypothetical standard is indeed only hypothetical. Instead, FMALI must present a "compelling case" that these considerations make jurisdiction "unreasonable." This it cannot do given that FMALI is, far from being an unsophisticated individual debtor, a corporation of many employees that voluntarily entered a million-dollar interstate contract after substantial negotiations. In any event, even if some consideration did make assertion of jurisdiction unreasonable, it could likely "be accommodated through means short of finding jurisdiction unconstitutional." See Burger King, 471 U.S. at 477, 105 S.Ct. at 2184–85. The Burger King Court cited as an example the possibility of remedying a defendant's substantial inconvenience with a change of venue, if warranted under applicable law. To this possibility the court now turns.

## C. The Motion For A Transfer Of Venue

■ FMALI has moved, in the alternative to dismissal, to transfer this action to California pursuant to 28 U.S.C. § 1404(a). This section allows transfer of an action "for the convenience of the parties and witnesses" and "in the interest of justice." FMALI, as the movant, has the burden to show a transfer is proper. Verosol B.V. v. Hunter Douglas, Inc., 806 F.Supp. 582, 592 (E.D.Va.1992). This burden is especially great where, as here, the court must accord great weight to Reynolds's choice of forum. Such deference is appropriate because the court is satisfied

that Reynolds has not chosen a foreign forum or one bearing "little or no relation" to the cause of action. Id.; see also Chedid v. Boardwalk Regency Corp., 756 F.Supp. 941, 945 (E.D.Va.1991); Board of Trustees, Sheet Metal Workers Nat'l Fund v. Baylor Heating and Air Conditioning, Inc., 702 F.Supp. 1253, 1256 (E.D.Va.1988). Thus, FMALI must show "that the deference due plaintiff's choice of venue is 'clearly outweighed by other factors.'" Id. (citations omitted).

To overcome its burden, FMALI may suggest several considerations that the court must balance in exercising sound discretion. These include "the convenience of the parties and witnesses; the cost of obtaining the attendance of witnesses; the availability of compulsory process; the interest in having local controversies decided at home; ... the court's familiarity with the applicable law; and the interest of justice." Verosol, 806 F.Supp. at 592. Again, while these factors might suggest California would be an ideal forum for FMALI (as mentioned above), FMALI cannot overcome the burden created by Reynolds's choice of a Virginia forum.

■ In contrast to Verosol, transfer in this case would only operate to shift the burden, a burden that exists inherently in interstate litigation, to Reynolds. See id. at 593 (noting that, while transfer would substantially reduce inconvenience to the defendant, plaintiffs had "not demonstrated that they or their witnesses [would] incur any greater burden if the action" were transferred); see also Schwartz v. Yo–Whip, Inc., 795 F.Supp. 869, 871 (N.D.Ill.1992) (noting that, even where the defendant is inconvenienced, transfer is inappropriate if it would only shift the inconvenience). Here, at the very least, Reynolds would be burdened by the need to send to California employees and documents from Richmond relevant to the manufacture of packages and to communications with FMALI concerning the technical specifications of the packages. See FDIC v. Citizens Bank & Trust Co., 592 F.2d 364, 368 (7th Cir.), cert. denied, 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979) (finding no need to transfer where the plaintiff's witnesses were in the forum, despite the defendant's contention that its witnesses and much of the evidence

were elsewhere); *Eastern Scientific Mktg., Inc. v. Tekna–Seal, Inc.,* 696 F.Supp. 173, 180 (E.D.Va.1988) (concluding that transfer would merely shift the burden of litigating where, although the defendant had witnesses and documents in another forum, other witnesses and files were within the Virginia forum's subpoena power).

Ultimately, Virginia, as the state in which the product was manufactured, as the state in which many of Reynolds's witnesses and documents can be found, and as the state whose law would most likely be applied, is a proper venue for this lawsuit. FMALI has not shown that transfer of venue is warranted or required.

### CONCLUSION

For the foregoing reasons, FMALI's motion to dismiss or transfer is denied. The long arm of Virginia's courts constitutionally reaches the California corporation, and the Virginia manufacturer is entitled to its choice of forum.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.