**OPTICAL CABLE CORPORATION, Plaintiff,**

v.

**MASS. ELECTRIC CONSTRUCTION COMPANY, Defendant.**

**No. 97–0371–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

May 1, 1998.

Claude Marshall Lauck, Glenn, Feldman, Darby & Goodlatte, Roanoke, for Optical Cable Corporation, plaintiffs.

Sara Bugbee Winn, Woods, Rogers & Hazlegrove, P.L.C., William B. Poff, Woods, Rogers & Hazlegrove, P.L.C., Mark D. Loftis, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, Kieran B. Meagher, City, Hayes, Meagher & Dissette, P.C., Boston, MA, for Mass. Electric Construction Co., defendants.

## MEMORANDUM OPINION

KISER, Senior District Judge.

In this declaratory judgment action, plaintiff, Optical Cable Corporation ("Optical"), seeks to establish its warranty obligations and rights in connection with goods sold to defendant, Massachusetts Electric Construction Company ("Mass.Electric"). Optical seeks a declaration that it is bound only by the warranty provision contained in its Standard Terms and Conditions, and not by the Guarantee of Work provision which Mass. Electric alleges was incorporated into the contract. Optical also seeks a declaration that it has no present or future warranty obligations to Mass. Electric. Complaint at ¶ 7.

Since 1996, Mass. Electric has claimed that it is entitled to certain warranty protections for the goods it purchased from Optical. Optical argues that the actual warranty is far more limited than Mass. Electric contends.

Optical moved for summary judgment. After Optical filed this motion for Summary Judgment, Mass. Electric filed a counterclaim. In its counterclaim, Mass. Electric asserts claims for breach of contract, breach of express and implied warranties, strict liability, negligence, and indemnity.

Jurisdiction over both the claim and the counterclaim is based upon 28 U.S.C. § 1332. Mass. Electric is a Massachusetts corporation, and Optical is a Virginia Corporation. The amount in controversy exceeds $75,000.00.

Before me now is plaintiff's motion for summary judgment, defendant's motion for change of venue, and defendant's motion to strike portions of plaintiff's affidavits. The parties have fully briefed the issues involved and have presented oral argument. The motions are therefore ripe for disposition. For the reasons contained herein, plaintiff's motion for summary judgment is DENIED, defendant's motion for change of venue is DENIED, and defendant's motion to strike portions of plaintiff's affidavits is DENIED.

## I. BACKGROUND

Mass. Electric, which maintains its principal place of business in Boston, Massachusetts, engages in the business of electric construction. Optical is a Virginia Corporation that manufactures and sells fiber optic cable from its facility in Roanoke, Virginia.

In the early 1990's, the Bay Area Regional Transit District ("BART") was seeking to install an automatic train control system for its subway in the San Francisco Bay Area of California. The project was known as BART 93YF–150. General Railway Signal was the general contractor on the project. In 1992, Mass. Electric began formulating a bid to be the subcontractor that would actually install the automatic train control system.

Optical apparently communicated with BART in an attempt to persuade BART to set and choose specifications for the fiber optic cable which would increase the likelihood that Optical's cable would be used by the electrical subcontractor. See Huybrechts affidavit at ¶¶ 2, 4. Mass. Electric asserts that the relationship between BART and Optical was more involved. According to Mass. Electric, Optical informed Mass. Electric officials that the BART contract had been written as a "proprietary specification" for Optical's fiber optic cable. This would mean that the cable specifications had been written in such a way as to exclude all cable manufacturers except for Optical. Breen Affidavit at ¶ 7. Optical denies this contention.[1] As noted by Optical, public contracts such as the BART project generally allow cable "of equal type." Melson deposition at 11. Thus, a competitor of Optical could have provided the cable. Id.; see also Huybrechts affidavit at ¶ 4.[2]

In 1992, Optical was involved in efforts to sell cable for use in various BART projects, including 93YF–150. See Huybrechts affidavit at ¶ 2. Optical, through its inside sales force and independent sales representatives, initiated contacted with Mass. Electric. Breen affidavit at ¶ 6. Silvaco was the independent sales representative involved in BART 93YF–150.

In order to bid for the installation subcontract, Mass. Electric had to take bids from prospective sub-sub-contractors, such as Optical, for the provision of the fiber optic cable to be used in the project. In addition to Optical, Mass. Electric acquired a quote for fiber optic cable from Chromatic. Optical also supplied a quote for fiber optic cable to Fischbach & Moore, a competitor of Mass. Electric that was also bidding on the installation sub-contract. On March 12, 1992, Fischbach & Moore provided Optical with the final specifications for the fiber optic cable to be used in the BART 150 project.[3] See Mass. Electric Exhibit 1.

---

1. Optical contends that Breen's affidavit is inadmissible hearsay. I disagree. The statement is a party admission.

2. Optical's claim is supported by the fact that Mass. Electric also obtained a quote for fiber optic cable from Chromatic.

3. It is unclear if Optical had the specifications from its prior communications with BART. In any event, it is clear that Optical had the technical specifications for the cable when it first began negotiations with Mass. Electric. In addition to the precise technical specifications, the BART documents provided by Fischbach &

On March 23, 1992, Silvaco contacted Optical, requesting that a quotation for 125,000 feet of fiber optic cable be sent to Mass. Electric.[4] *See* Mass. Electric Exhibit 2. Optical sent the quote directly to Mass. Electric that same day.[5] *See* Mass. Electric Exhibit 5. The first page included the quoted price which was $1.73 per foot of 7–channel cable.[6] The first page also included provisions that any order would be FOB Roanoke and subject to a charge for up to 10% overage.[7] The first page also stated that Optical's "Standard Terms and Conditions" applied to any resulting order and that there were no exceptions to the Standard Terms and Conditions. The Standard Terms and Conditions were attached to the back of the May 23, 1992 fax.[8]

Optical's Standard Terms and Conditions restated that any shipment of cable would be FOB Roanoke and would be subject to a 10% overrun charge on all custom fabricated cables. Among several other provisions, the Standard Terms and Conditions included a warranty clause:

> LIMITED WARRANTY: 90 days (from invoice date) against defects in materials and workmanship. [Optical]'s responsibility is limited to repair or replacement and only when returned to the [Optical] Facility under an [Optical] issued RMA number at Buyer's expense.

There is uncertainty in the evidence as to exactly what happened between March 23 and June 10, 1992. It is undisputed that at some point between those dates Mass. Electric informed Optical that it had received a lower quote for fiber optic cable from Chromatic. Optical contends that this occurred prior to March 25 and that on that day it sent Mass. Electric a revised quote of $0.97 per foot for the cable. Plaintiff's Memorandum in Support of Summary Judgment at 6; Booze affidavit at ¶ 4; Huybrechts affidavit at ¶ 7.

The evidence does not bear out that conclusion, however. The exhibits and depositions indicate that Optical did provide Mass. Electric with a revised quote on March 25, 1992. That revised quote, however, was $1.68 for 7–channel cable and $1.09 for 4–channel cable. *See* Mass. Electric Exhibit 8. Mass. Electric admitted in its brief that it received Optical's Standard Terms and Conditions with the March 25 fax. *See* Brief in Opposition to Plaintiff's Motion for Summary Judgment at 5 n.4. The evidence further indicates that Optical provided the $0.97 per foot quote for 125,000 feet of 4–channel fiber optic cable on June 10, 1992. *See* Mass. Electric Exhibit 16. It would seem, therefore, that Mass. Electric informed Optical about Chromatic's lower bid between March 25 and June 10.

The June 10, 1992 fax from Optical to Mass. Electric included the statement that Optical's Standard Terms and Conditions applied and the statement that there were no exceptions to these Standard Terms and Conditions. The fax also included, on the cover page, the FOB Roanoke and 10% overrun terms. The complete list of Standard

---

Moore called for cable with a life expectancy of 40 years and prior approval of the cable providers quality control plan.

4. Mass. Electric did not supply Optical with technical specifications for the cable at that time. Mr. Booze stated that it was likely that Optical relied upon the Fischbach & Moore specifications in preparing the quote for Mass. Electric. Booze deposition at 46–48, 80.

5. The quote was sent to Nick Enfanto. At the time Enfanto was a project director with Mass. Electric. Shortly thereafter, Enfanto died.

6. 7–channel cable is cable with seven fibers running through it.

7. The 10% overage, or 10% overrun, provision permits Optical to charge Mass. Electric for up to 10% more cable than is actually ordered.

8. In its first response to Optical's motion for summary judgment, Mass. Electric stated that it did not receive the Standard Terms and Conditions with the March 23, 1992 fax. Brief in Opposition to Plaintiff's Motion for Summary Judgment at 5. After more investigation, Mass. Electric later admitted to finding the Standard Terms and Conditions attached to a fax dated March 23, 1992 in Mr. Enfanto's files.

Terms and Conditions, including the warranty provision, was not attached to this fax, however.

Subsequently on June 10, 1992, Mass. Electric claims to have sent a purchase order to Optical for 125,000 feet of fiber optic cable at $0.97 per foot.[9] *See* Mass. Electric Exhibit 18. Mass. Electric claims that it placed a verbal hold on the order, however. Murphy affidavit at ¶ 4.[10] Optical denies ever receiving a purchase order from Mass. Electric on or around June 10, 1992.

Mass. Electric's purchase order was numbered 10084-1. It listed the job name as BART Contract 93YF-150. It also stated that the cable was to be shipped FOB job site and that there was no overrun tolerance. The purchase order also stated that Optical was to furnish the fiber optic cable "complete and in strict compliance with plans and specifications. All material shall be furnished in strict accordance with contract documents, including plans and specifications and all addenda, and subject to review of approving authorities." Specifications for the fiber optic cable were attached, but the BART Contract 93YF-150 was not attached.[11]

Mass. Electric claims that the above language incorporated the BART 93YF-150 general contract into the contract between Mass. Electric and Optical. Brief in Opposition to Plaintiff's Motion for Summary Judgment at 5-6; Murphy affidavit at ¶¶ 7-9. The BART Contract 93YF-150 contains a provision which required any legal action in this matter to be filed in the Northern District of California and resolved pursuant to California law. Murphy affidavit Exhibit C.

The BART contract also contains a warranty provision which requires equipment, materials and labor to be warranted for three years after final acceptance of the project by the owner, or two years after the start of revenue service for an individual extension of train lines, whichever occurred later ("the Guaranty of Work provision"). Murphy affidavit Exhibit D.

Additionally, the Purchase Order Conditions listed on the back of purchase order 10084-1 required that any modifications to the terms of the purchase order be made in writing. The Purchase Order Conditions also stated that the vendor will indemnify the vendee for any expenses, including attorney's fees, resulting from property damage caused by the vendor's negligence.

On June 11, 1992, Optical sent Mass. Electric a revised quotation.[12] *See* Mass. Electric Exhibit 19. The new quotation removed the 10% overrun provision. The alteration did not change the price. The June 11, 1992 fax included Optical's Standard Terms and Conditions.

According to Optical, Mass. Electric agreed to purchase the fiber optic cable from Optical during a July 6, 1992 phone conversation. Melson deposition at 49-50; Brief in Support of Motion or Summary Judgment at 7.[13] The oral agreement. however, was conditioned upon Mass. Electric's approval of Optical's quality control plan. Optical received notification on August 24, 1992 that Mass. Electric had approved its quality control plan. Melson affidavit at ¶ 8.

---

**9.** This purchase order was sent after receiving Optical's fax. *See* Brief in Opposition to Plaintiff's Motion for Summary Judgment at 5. It is unclear whether Mass. Electric faxed or mailed the purchase order.

**10.** There are two Mass. Electric purchase orders dated June 10, 1992: one addressed to Optical and another addressed to RPM Supply Co., Inc ("RPM"). The June 10, 1992 purchase order apparently was not sent to RPM at that time. It apparently was sent to RPM when Mass. Electric approved Optical's quality control plan in August of 1992. *See* Mapp Affidavit at ¶ 3.

**11.** The technical specifications were similar to, but less inclusive than, the Fischbach & Moore

specifications. The specifications provided by Mass. Electric did not include the 40 year minimum service life provision or the requirement that Mass. Electric approve Optical's quality control plan.

**12.** Since it is unclear whether the June 10 purchase order was faxed or mailed, it is unclear whether this quotation was sent before or after receiving the alleged June 10 purchase order.

**13.** In its reply brief, however, Optical argues that the contract between the parties was formed when Mass. Electric sent Optical its purchase order. *See* Reply Brief in Support of Motion for Summary Judgment at 8.

In August of 1992, Mass. Electric placed an order for Optical's cable with RPM Supply Co., Inc.[14] This purchase order was a copy of the June 10, 1992 purchase order which allegedly had been sent to Optical. This copy of the June 10, 1992 purchase order was addressed to RPM, however. *See supra* at 5 n. 10. RPM forwarded this purchase order to Optical on September 25, 1992. Mapp affidavit at ¶ 4; *see* Mass. Electric Exhibit 26.

At some point during the early Fall of 1992, Mass. Electric and Optical negotiated changes to certain terms of the agreement relating to payment and shipping. Murphy affidavit at ¶ 10; Huybrechts affidavit at ¶ 9. The terms of the agreement were changed from FOB Roanoke to FOB job site, and Mass. Electric agreed to pay within 10 days rather than 30 days. It is unclear exactly when these changes took place.[15] Optical claims that these were changes to its Standard Terms and Conditions; *see* Melson affidavit at ¶ 9; Mass. Electric Exhibit 30. Mass. Electric claims that these were changes to its purchase order. *See* Murphy affidavit at ¶ 10; Mapp affidavit at ¶ 5. The parties did not negotiate any warranty or venue terms.

On July 8, 1993, Optical received from Silvaco a purchase order which had been forwarded from RPM. *See* Mass. Electric Exhibit 35. The purchase order was an exact copy of the purchase order allegedly sent by RPM to Optical on September 25, 1992. According to Optical, the purpose of this purchase order was to officially substitute RPM for Mass. Electric as the purchaser. Melson affidavit at ¶ 10; Melson deposition at 104. Attached to the RPM purchase order was an exact copy of Mass. Electric's June 10 purchase order to RPM. Attached to this purchase order were the technical specifications for the fiber optic cable. The July 8, 1993 purchase order, just like the alleged June 10, 1992 purchase order, did not include the provisions of the BART contract which it claims to incorporate by reference. Optical claims that July 8th was the first time they received a copy of Mass. Electric's purchase order, either directly from Mass. Electric or via RPM. *See* Melson deposition at 91.[16]

Thereafter, Optical and Mass. Electric agreed to increase the purchase price from $0.97 per foot to $1.01 per foot. The parties also agreed to change the amount of the order from 125,000 feet of cable to 124,100 feet of cable. *See* Melson affidavit at ¶ 11. An acknowledgment of these changes was sent from Optical to RPM. *See* Mass. Electric Exhibit 42. The acknowledgment stated that the contract was subject to Optical's Standard Terms and Conditions. Optical's Standard Terms and Conditions apparently were included with the fax. *See* Melson affidavit Exhibit 5.

Optical produced the cable at its Roanoke facility and shipped it to the project site in California on August 24, 1993. *See* Mass. Electric Exhibit 44. Optical also invoiced RPM on August 24, 1993. *See* Mass. Electric Exhibit 43. The cable was installed in 1994 and used intermittently until 1995. In November of 1995, the cable was placed in full-time service. In May of 1996, BART began to experience problems with the cable, and in June of 1996, approximately 4,000 feet of the cable "failed." BART and Mass. Electric personnel spent considerable time diagnosing the problem with the cable. Subsequent to the testing by BART and Mass. Electric personnel, three other sections of the cable failed. Breen affidavit at ¶¶ 8–11.

By letter dated June 27, 1996, Mass. Electric notified Optical that the cable had

---

**14.** RPM is a minority-owned distributor. RPM was used to accommodate a provision in the BART general contract which required Mass. Electric to use minority suppliers. Murphy affidavit at ¶ 6. RPM is neither an agent of Mass. Electric or Optical.

**15.** There is a letter from Optical to RPM dated October 9, 1992 which confirms the above referenced changes. *See* Mass. Electric Exhibit 30.

**16.** The exhibits contain a copy of Mass. Electric's June 10, 1992 purchase order which is addressed to Optical in Roanoke. Also, RPM's CEO, Robert Mapp, stated in his affidavit that RPM sent its purchase order (R–16655) and a copy of Mass. Electric's purchase order (10084–1) to Optical on September 25, 1992. Additionally, Optical has several internal documents dated before July 8, 1993 which reference purchase orders 10084–1 and R–16655.

"failed." Mass. Electric informed Optical that the contract was subject to the three year Guarantee of Work provision. Optical contends that the letter of June 27, 1996 was the first time it was provided a copy of the Guaranty of Work provision. In any event, Optical provided Mass. Electric with additional cable. Mass. Electric used the additional cable to replace all of the failed cable. On May 7, 1997, Mass. Electric made a demand on Optical for $122,835.99 for "costs associated with replacing the failed cable."

Plaintiff now seeks a declaration that the warranty contained in its Standard Terms and Conditions is the warranty provided for in the Optical/Mass. Electric contract. Optical also seeks a declaration that it is not bound by Mass. Electric's Guaranty of Work provision and that it has no further warranty obligations to Mass. Electric.

Defendant Mass. Electric denies the allegations made by Optical and counterclaims. Mass. Electric contends that Optical made numerous express and implied warranties to Mass. Electric and that these warranties were breached. Mass. Electric also moves to transfer venue of this matter to the Northern District of California and to strike portions of affidavits submitted by Optical.

## II. MOTION TO STRIKE

Mass. Electric moves this court to strike portions of the affidavits of A.G. Melson, Jr., Robert S. Booze, and Luke J. Huybrechts. Mass. Electric claims that these objected to statements are not based on personal knowledge as is required by Rule 56. Fed. R.Civ.P. 56(e) ("supporting and opposing affidavits shall be made on personal knowledge").

■ Mass. Electric makes three general arguments in support of its claim that Optical's affiants lacked personal knowledge. None of these three arguments is sufficient to strike the respective portions of the affidavits. First, Mass. Electric claims that the affiants contradicted themselves during their deposition testimony. Melson ¶¶ 9, 10 (first sentence), 10 (second and third sentence), 13; Booze ¶ 4; Huybrechts ¶ 8. To the extent that statements in the affidavits are contra-

dicted by an affiant's deposition testimony, I will view such conflicts in the evidence in the light most favorable to the non-moving party, Mass. Electric. Second, Mass. Electric claims that the affiants based their statements on documents rather than personal knowledge. Melson ¶¶ 9, 10 (first sentence), 10 (second and third sentence); Booze ¶ 4; Huybrechts ¶ 7. An affiant may use documents to refresh his recollection. The use of such documents does not mean that an affiant lacks personal knowledge. Third, Mass. Electric claims that the affiants made general declarations regarding disclosures to Optical or about Optical's knowledge regarding certain terms of the BART general contract. Melson ¶ 13; Huybrechts ¶ 10. Such statements will obviously be limited to that individual's personal knowledge of any disclosures or knowledge, and not to any corporate knowledge on the part of Optical.

Accordingly, the motion to strike is DENIED.

## III. MOTION FOR SUMMARY JUDGMENT

Optical seeks summary judgment on the grounds that its 90-day warranty provision governs its obligations under the Optical/Mass. Electric contract. Optical argues, therefore, that it is not liable for any failure of the cable beyond the 90-day period. Mass. Electric argues that a factual issue exists as to whether or not its purchase order incorporated the Guarantee of Work provision from the BART general contract into the Optical/Mass. Electric contract. I agree with Mass. Electric; too many factual issues remain to resolve this matter on summary judgment. Accordingly, the motion for summary judgment is denied.

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied*, 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where a nonmoving party fails to establish an essential element of its case, all other facts are rendered immaterial, and entry of summary judgment is required as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. Legal Analysis

### i) Choice of Law

This sale of fiber optic cable is a sale of goods governed by the Uniform Commercial Code. In briefing these motions, the parties have cited exclusively to Virginia's version of the U.C.C., which is codified at Virginia Code § 8.1–101 through § 8.2–725. It is unclear whether Virginia law applies to this case, however.

In determining the applicable law in this diversity action, I look to the choice of law rules for the Commonwealth of Virginia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (in diversity cases, district court should apply choice of law rules of state in which it sits). According to Virginia Code § 8.1–105, the parties may agree that the law of another state to which the transaction bears a reasonable relation governs their rights and duties under the contract. Absent such an agreement, I must examine the relationship between the transaction and the Commonwealth of Virginia to determine if there is an "appropriate relationship" justifying the application of Virginia law. Va.Code § 8.1–105(1).

Mass. Electric contends that the parties have agreed to a choice of law clause declaring that California law governs this transaction. As discussed below, a factual issue remains as to whether or not Mass. Electric's purchase order incorporated the choice of law clause into the Optical/Mass. Electric contract. There is a reasonable relation between the transaction and California, the destination of the fiber optic cable. Thus, if it turns out that the purchase order successfully incorporated the choice of law clause, then I will apply California's version of the U.C.C. There also is an appropriate relationship between this transaction and the Commonwealth of Virginia, the place where the goods in question are being produced. If the choice of law clause was not adequately incorporated, then I will apply Virginia's version of the U.C.C.

### ii) Contract Formation and Terms

The parties agree that the existence of their contract and the terms of that contract are governed by § 2–207 of the Uniform Commercial Code. I agree with this assessment.

Section 207 of the U.C.C. is less than artfully drafted.[17] It is clear, however, that it "provides for two quite different means for creation of a contract." *Ebasco Services Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421, 436 (E.D.Pa.1975). Subsections (1) and (2) of § 2–207 contemplate the creation of a contract by the parties' writings.

---

17. *See, e.g., Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1165 (6th Cir.1972) ("This section of the U.C.C. has been described as a murky bit of prose, as not too happily drafted, and as one of the most important, subtle, and difficult in the entire Code, and well it may be said that the product as it finally reads is not altogether satisfactory.") (internal quotations and citations omitted); *Ebasco Services Inc. v. Pennsylvania Power* & *Light Co.*, 402 F.Supp. 421, 436 (E.D.Pa.1975) ("Subsections 2–207(1) and (2) are, perhaps, less than adequately drafted."); J. White & R. Summers, *Uniform Commercial Code* §§ 1–2, at 24 (1972) ("Unfortunately [§ 2–207] is in one respect like the amphibious tank that was originally designed to fight in the swamps, but was ultimately sent to fight in the desert.").

*Id.*[18] Subsection (3) involves a situation in which the parties' writings fail to establish a contract, but the parties nonetheless perform as if a contract had been formed. *Id.; see also Valtrol, Inc. v. General Connectors Corp.*, 884 F.2d 149, 155 (4th Cir.1989) (section 2–207(3) "applies only in cases where the writings of the parties do not otherwise establish a contract."); *Reaction Molding Technologies, Inc. v. General Elec. Co.*, 585 F.Supp. 1097, 1105 (E.D.Pa.1984) ("Even though the documents between the parties do not create a contract under § 2–207(1), however, § 2–207(3) provides that there may be a contract if the parties' conduct recognizes the existence of a contract.").

Where a contract is formed under subsection (1), subsection (2) is used to determine the terms of the contract. *Reaction Molding*, 585 F.Supp. at 1105. Under § 2–207(2), the terms of a contract between merchants will consist of the terms on which the forms agree and any additional terms in the acceptance, unless the offer expressly limited acceptance to its terms, the additional terms materially alter the offer, or the offeror objects to the additional terms within a reasonable time. *Id.*[19] Where a contract is formed by conduct under subsection (3), subsection (3) also provides the terms of the contract. *See* U.C.C. § 2–207, Official Comment at ¶ 7 ("In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine

which act or document constituted the offer and which the acceptance. The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule."); *Reaction Molding*, 585 F.Supp. at 1105 (Under subsection (3), "the terms consist of those terms on which the writings agree and any supplementary terms incorporated under other provisions of the act.").

### C. Disputed Factual Issues

■ There are numerous unresolved factual questions which bear on the terms of the Optical/Mass. Electric contract. An issue remains as to when and how the contract was formed. The parties disagree about when they finalized their agreement. At oral argument, Mass. Electric contended that its June 10, 1992 purchase order accepted Optical's offer. In its Brief in Support of its Motion for Summary Judgment, Optical argued that the contract was actually finalized in a July 6, 1992 phone conversation between A.G. Melson of Optical and Joseph Murphy of Mass. Electric. According to Optical, the acceptance was conditioned upon Mass. Electric's approval of Optical's quality control plan. The quality control plan was approved on August 24, 1992. In its Reply Brief in Support of its Motion for Summary Judgment, however, Optical argued that the contract was formed when it received Mass. Electric's purchase order. Presumably, Optical viewed the July 8, 1993 purchase order as the acceptance since it denies receiving the alleged June and September purchase orders.

---

**18.** "Section 2–207(1) covers two situations. First, it recognizes that a 'definite and seasonable expression of acceptance' will be treated as an acceptance even though it states terms additional to or different from the offer. Secondly, it applies where the parties have reached an oral agreement and one or both parties send a written confirmation of the agreement. The written confirmation, in that instance, is considered an acceptance even though it states terms additional to or different from the oral agreement. This second application appears illogical because if an oral agreement has already been reached, there should be no need for an 'acceptance.' It seems, however, that the primary purpose of the written confirmation rule is to allow parties to enforce contracts that would be unenforceable due to the statute of frauds." *Reaction Molding Technologies, Inc. v. General Elec. Co.*, 585 F.Supp. 1097,

1104–05 (E.D.Pa.1984), *opinion amended by Reaction Molding Technologies, Inc. v. General Elec. Co.*, 588 F.Supp. 1280 (E.D.Pa.1984).

**19.** There is a debate as to how subsection (2) treats "different," or contradicting, terms. For a discussion of the disagreement, see generally *Valtrol*, 884 F.2d at 155; *Reaction Molding*, 585 F.Supp. at 1105; *Reaction Molding*, 588 F.Supp. 1280, 1289 (E.D.Pa.1984); *Southern Idaho Pipe & Steel Co. v. Cal–Cut Pipe & Supply, Inc.*, 98 Idaho 495, 567 P.2d 1246 (1977); *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173 (7th Cir. 1994); Ronald A. Anderson, *Uniform Commercial Code*, § 2–207:107–110 (Clark, Boardman, & Callaghan 1997); William D. Hawkland, *Uniform Commercial Code Series*, § 2–207:3 (Clark, Boardman, & Callaghan 1996).

Each of these contentions has evidentiary support. A trier of fact could find that the parties entered the contract on June 10, 1992, July 6, 1992, August 24, 1992, September 25, 1992, or July 8, 1993. Alternatively, given the constant changes to the price, quantity, shipping and payment terms, the trier of fact could also determine that the parties writings never created a contract. In that case, the contract would have been formed by the parties' conduct. A determination of this factual issue will directly impact the terms of the contract under § 2-207.

A second unresolved factual issue is whether the individuals negotiating the Optical/Mass. Electric contract considered the changes to the price, quantity, shipping and payment terms as changes to Optical's quote or changes to Mass. Electric's purchase order. Such a determination would obviously impact the terms of the contract, as understood by the parties.

An additional unresolved factual issue involves the alleged incorporation of the BART general contract into the Optical/Mass. Electric contract. "Implicit in U.C.C. § 2-207 is the premise that the existence of the additional term is adequately communicated to the person against whom it is to operate. In some instances, the additional term does not present any problem because it was never adequately communicated to the other party, and therefore it cannot be part of the contract nor can it be effective as an offer." Ronald A. Anderson, *Uniform Commercial Code*, § 2-207:49 (Clark, Boardman, & Callaghan 1997). It is uncertain whether Optical's officials believed "contract documents," as used in the purchase order, applied only to the attached plans and specifications, or whether they had reason to know that it referenced the entire BART general contract. It is also uncertain whether any usages in the trade or prior course of dealing imputed upon Optical the responsibility of ascertaining those "contract documents," or whether Mass. Electric had the burden of providing the documents. Finally, it is unclear whether Optical, through its relationship with BART, may have already been aware of the allegedly incorporated contract provisions. The resolution of this issue will directly influence the determination regarding the warranty provision of the Optical/Mass. Electric contract.

These are a few of the factual issues which must be resolved. These disputed factual issues prevent me from resolving this matter at this stage of the proceedings. Accordingly, Optical's motion for summary judgment is DENIED.

## IV. MOTION FOR CHANGE OF VENUE

■ Finally, Mass. Electric filed a motion for change of venue under 28 U.S.C. § 1404(a). Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Decisions whether to transfer a case pursuant to 28 U.S.C. § 1404 are committed to the discretion of the transferring judge." *Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1257 (4th Cir.1991) (citing *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). Mass. Electric seeks to transfer this action to the Northern District of California. Mass. Electric presented two justifications for its motion. Because I do not find either of its arguments persuasive, the motion is denied.

■ First, Mass. Electric contends that the venue provision of the BART general contract was incorporated into the Optical/Mass. Electric contract. A valid forum selection clause would be a "significant factor" in ruling on Mass. Electric's motion. *Id.* at 1258 (citing *Stewart Organization*, 487 U.S. at 29, 108 S.Ct. 2239). As discussed in the previous section, however, a significant factual issue remains as to whether or not the forum selection clause was incorporated into the Optical/Mass. Electric contract. I will not transfer this case based upon a forum selection clause of which Optical may not have been aware.

■ Second, Mass. Electric argues that the "interests of justice" require that this case be transferred to the Northern District of California. *See Stewart Organization*, 487

U.S. at 30, 108 S.Ct. 2239. The factors which bear on the interests of justice include: (1) the convenience of the witnesses; (2) the convenience of the parties; (3) systemic integrity; (4) fairness; (5) the availability of compulsory process; (6) the cost of obtaining the attendance of witnesses; (7) ease of access to sources of proof; and (8) the interests in having local controversies decided at home. *See* Fed.R.Civ.P. 56(e); *Stewart Organization,* 487 U.S. at 29–31, 108 S.Ct. 2239; *Brock,* 933 F.2d at 1257–58; *Glamorgan Coal Corp. v. Ratners Group, P.L.C.,* 854 F.Supp. 436, 437–38 (W.D.Va.1993); *Akers v. Norfolk & Western Ry.,* 378 F.2d 78, 79 (4th Cir. 1967); *Reynolds Metals Co. v. FMALI, Inc.,* 862 F.Supp. 1496, 1501 (E.D.Va.1994). "The weight given to these factors should be commensurate with the degree each impacts the policy behind section 1404(a), that is, to make the trial 'easy, expeditious and inexpensive.'" *Glamorgan,* 854 F.Supp. at 437 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

■ In determining a motion for change of venue, "the court must accord great weight to plaintiff's choice of forum." *Reynolds Metals,* 862 F.Supp. at 1501; *see also Glamorgan,* 854 F.Supp. at 437 ("[P]laintiff's choice of forum is entitled to a degree of deference, especially when, as in this case, it chooses to file suit in the district and division in which it resides.") (citations omitted). Deference to Optical's choice of forum is appropriate here because it has not chosen a foreign forum or one bearing little or no relation to the cause of action. *See Reynolds Metals,* 862 F.Supp. at 1501; *Glamorgan,* 854 F.Supp. at 438. "It is defendant['s] burden to disturb the plaintiff's choice of forum by showing that 'the balance of equities is in [its] favor [and] that judicial economy and convenience to all parties favor suit in another forum.'" *Glamorgan,* 854 F.Supp. at 437–38 (quoting *Eldridge v. Bouchard,* 620 F.Supp. 678, 684 (W.D.Va.1985)). "Thus, [Mass. Electric] must show 'that the deference due plaintiff's choice of venue is clearly outweighed by other factors'" *Reynolds Metals,* 862 F.Supp. at 1501.

■ Mass. Electric has failed to make such a showing. Mass. Electric relies on three arguments in support of its "interests of justice" claim. First, it argues that this cause of action arose in California, and therefore California has a superior interest in its resolution. Second, it argues that numerous crucial documents are at the California project site. Third, and more convincingly, Mass. Electric argues that it intends to call thirteen non-party witnesses from California.[20]

I disagree with Mass. Electric, the declaratory cause of action did not arise in California. The declaratory judgment involves the formation and terms of the contract; it does not involve matters relating to breach of the contract. The issue of breach was introduced by the counterclaim. The contract was negotiated between Virginia and Massachusetts while the breach, if any, took place in California. California may have more of an interest in the resolution of the breach issue, but Virginia has a substantial interest in the determining the terms of the Optical/Mass. Electric contract. Accordingly, I find that Virginia's interest in the final resolution of the declaratory judgment and the counterclaim is at least equal to that of California.

As to the second argument, many of the documents bearing on the terms of the Optical/Mass. Electric contract are already before the court. Any additional documents bearing on the declaratory judgment or the counterclaim are likely to come form Virginia, Massachusetts and California. To transfer this trial to California because some, perhaps even most, of the additional documents are from there will result in inconveniencing Optical to the benefit of Mass. Electric. I will not merely shift the burden from one party to another, especially given the presumption in favor of Optical's choice of venue.

---

**20.** Mass. Electric also argues that California law will apply under the choice of law clause, and that the interests of justice require me to enforce the forum selection clause. These do not influ-

ence my decision, of course, since it is far from certain that Optical was made aware of either of these provisions.

The same reasoning prevents me from transferring the case because of Mass. Electric's thirteen non-party witnesses. I am sympathetic to Mass. Electric's concern about the cost bringing those witnesses to Virginia or, alternatively, the use of depositions at trial. Transferring this case, however, would impose an equal cost and inconvenience upon Optical. Without more, and in the presence of a strong connection between the Commonwealth and the transaction, I am unwilling to shift the burden from Optical to Mass. Electric.

Additionally, resolution of this single issue may resolve the entire matter, if its found that Optical's warranty provision applied and limited all other express and implied warranties. Thus, denying the motion to change venue is in the best interest of the primary objective of § 1404(a), the "easy, expeditious and inexpensive" resolution of this matter. I also find that, despite Mass. Electric's claims to the contrary, the witnesses, documents, and other proof most relevant to the contract at issue are in Virginia and Massachusetts. Thus, ease of access to sources of proof favors a venue on the East coast. Finally, fairness also favors Optical. Absent a valid and clearly applicable forum selection clause, I do not believe it to be fair to have the terms of the contract between Optical and Mass. Electric determined by a California court.

For these reasons, I find that the interests of justice weigh in favor of litigating this matter in this court, even given Mass. Electric's counterclaim. Therefore, Mass. Electric has not demonstrated sufficient interests of justice to overcome the presumption in favor the plaintiff's right to choose its forum. Accordingly, Mass. Electric's motion for change of venue is DENIED.

## V. CONCLUSION

For the aforementioned reasons, plaintiff's motion for summary judgment is DENIED, defendant's motion for change of venue is DENIED, and defendant's motion to strike is DENIED.